STATE OF NORTH CAROLINA v. JOHN HENRY FLEMING

No. 175A97

(Filed 9 April 1999)

1. Sentencing— capital sentencing—aggravating circumstance—heinous, atrocious, or cruel murder—constitutionality—sufficiency of evidence

The (e)(9) especially heinous, atrocious, or cruel aggravating circumstance is not unconstitutionally vague and overbroad. Furthermore, the evidence was sufficient to support submission of this aggravating circumstance to the jury where the State's evidence tended to show that the murder victim was repeatedly assaulted with a blunt object in his own home; as the victim struggled to defend himself, defendant continued to hit him on the head as the victim moved from the den, through the kitchen, and into the main hallway; the victim had multiple cuts and bruises on his head, arms, and right leg; the repeated blows to the victim's head did not render the victim unconscious; defendant then manually strangled the victim to the point where his hyoid bone was fractured; it took two minutes or more for the victim to loose consciousness when he was strangled; and the victim suffered great physical pain and torture as, already bloodied and bruised from the beatings, he was strangled so forcefully that his neck was repeatedly scratched.

2. Jury— denial of motion for individual voir dire and sequestration

The trial court did not abuse its discretion in the denial of defendant's motion for individual voir dire and sequestration of jurors during voir dire in a capital trial where the record did not support defendant's contention that prospective jurors who were unwilling to serve as jurors did not truthfully answer questions during voir dire.

3. Jury— statutory selection process—prospective juror called to occupied seat—nonmember polled—absence of prejudice

The defendant in a capital trial was not prejudiced by the jury selection process set forth in N.C.G.S. § 15A-1214(d) through (f) because a prospective juror was called to juror seat number ten which was already occupied by another juror where the person

called was never seated as a prospective juror, or because a person who was not a jury member was polled as a juror at the conclusion of the guilt-innocence phase of the trial.

**4. Appeal and Error— preservation of issues—constitutionality of statute—lack of oath at voir dire**

Defendant failed to preserve for appeal the issue of the constitutionality of the jury selection process set forth in N.C.G.S. § 15A-1214(d) through (f) where he did not raise this constitutional issue at trial. Likewise, defendant failed to preserve for appellate review the trial court's failure to require prospective jurors to swear to tell the truth during voir dire where he did not object to any lack of oath during voir dire.

**5. Jury— capital trial—jury selection—opposition to death penalty—challenge for cause—denial of rehabilitation attempt**

The trial court did not abuse its discretion in denying defendant's request to attempt to rehabilitate two prospective jurors challenged by the State for cause based upon their opposition to the death penalty where both jurors unequivocally stated that they could not recommend the death penalty under any circumstances.

**6. Jury— capital trial—jury selection—strong enough to impose death penalty—not improper stake-out question**

The prosecutor's questions to prospective jurors in a capital trial as to whether they were "strong enough" to recommend and impose the death penalty was not an improper "stake-out" question. Use of the term "strong enough" was not an impermissible inquiry as to the kind of verdict the prospective jurors would render or how they would be inclined to vote on a given state of facts.

**7. Criminal Law— jury selection—actions of trial judge—not partiality to prosecution**

The trial judge did not express an opinion or show partiality to the prosecution in this capital trial when he instructed the prosecutor during bench conferences to ask prospective jurors certain questions concerning their death penalty views where the trial judge also instructed defense counsel to ask certain questions, and it appears that the judge was merely fulfilling his duty to insure that a fair and impartial jury tried defendant's case.

**8. Criminal Law— capital trial—actions by trial judge—not improper assistance to prosecutor**

The trial judge did not express an opinion or show partiality to the prosecution in the guilt-innocence and sentencing phases of a capital trial when he interjected his own questioning during the prosecutor's examination of witnesses, instructed the prosecutor on the proper form of questions, suggested how the prosecutor should rephrase questions, intervened to correct improper questions by the prosecutor, and instructed the prosecutor to ask witnesses certain questions where the trial judge also interjected his own questioning while defense counsel was examining witnesses, interrupted defense counsel's questioning to clarify testimony, and instructed defense counsel to ask witnesses certain questions. Although the trial judge's actions might give the appearance of improper assistance to the prosecution, they are not sufficient to have had a prejudicial effect, especially in light of the fact that the judge aided both sides in formulating questions.

**9. Evidence— irrelevancy—murder trial—weakness of Virginia uttering charges**

In a first-degree murder prosecution in which the victim was the prosecuting witness on charges against defendant in Virginia of uttering forged checks belonging to the victim, testimony by the Virginia prosecutor that he thought the case against defendant on the uttering charges was weak was irrelevant and properly excluded by the trial court since it did not go to prove the existence of any fact of consequence in the determination of defendant's guilt of murder.

**10. Evidence— chain of custody—watch found at crime scene**

The trial court did not commit plain error by admitting into evidence a watch found at a murder scene, although the watch was not discovered until three days after the murder, the murder scene had not been secured, and a buckle which was initially on the watch was not on the watch at trial, where several witnesses testified that the watch was the same watch found at the murder scene and that it was defendant's watch; the watch was present in photographs of the scene taken on the day of the murder; and a member of the county sheriff's department testified that the watch was in the same condition as when it was found and that he maintained custody over the watch until it was trans-

ported to the SBI lab. Any alleged weakness in the chain of custody affected merely the weight, not the admissibility, of the watch.

**11. Criminal Law— recesses during voir dire and sentencing— no abuse of discretion**

The trial court did not improperly allow the prosecutor an opportunity to prompt his witness by allowing a recess during a voir dire hearing where the recess was apparently used by the prosecutor to insure that the witness adhered to the trial court's instruction not to mention that defense counsel may have discovered and moved a watch buckle during a jury view of the crime scene. Nor did the trial court improperly allow the prosecutor an opportunity to prompt a sentencing witness by taking a recess when the prosecutor objected to defendant's cross-examination of the witness, and the trial court informed the prosecutor that defense counsel's line of questioning was proper, told the prosecutor to instruct the witness to answer, and assured the prosecutor that the witness could clarify her testimony on redirect examination. Whether to call a recess was within the sound discretion of the trial judge, and the trial judge did not abuse his discretion.

**12. Criminal Law— jury view—unsecured crime scene**

The trial court did not abuse its discretion in allowing the State's motion for a jury view of a murder scene, although defendant argued that the scene was not secured and evidence there could have been tampered with, where the trial court was fully informed of all relevant facts and considered defendant's arguments when making its decision to permit the jury view. N.C.G.S. § 15A-1229(a).

**13. Appeal and Error— appellate review of testimony—transcript sufficient**

The transcript of defendant's murder trial was not so confusing as to render impossible appellate review of the testimony of an SBI agent who used a photograph to describe the location of blood splotches, the testimony of a deputy sheriff who used photographs and a diagram to aid his description of a shoe impression on a kitchen tile and the location of defendant's watch, and the testimony of a second SBI agent who used several exhibits to explain why the impression on the kitchen tile was identical to defendant's shoe. In order to prevent any alleged confusion in the

transcript, defendant had an opportunity to request that the witnesses mark on the exhibits as they testified but failed to do so; a reading of the transcript does not yield the level of confusion alleged by defendant; and the exhibits speak for themselves as to the blood spatters, watch, and shoe imprints.

**14. Evidence— polygraph test—inadmissibility**

Evidence concerning defendant's polygraph test was irrelevant and not admissible to show his cooperation with law officers or to show a consciousness of innocence.

**15. Criminal Law— ruling on evidence—facetious statement by trial judge—not pressure on defendant to testify or showing of partiality**

The trial judge's facetious statement, made when considering whether defendant's statement that he agreed to submit to a polygraph test was hearsay, "Fine. Call him. And let him say that he agreed to take the polygraph test," did not exert pressure on defendant to testify or show partiality by the trial judge against defendant, particularly since defendant did not take the stand during the guilt-innocence phase of the trial.

**16. Discovery— pathologist as witness—requirement of written report—provision to defendant—discretion of trial court**

Although there was no statutory requirement that a written report be prepared by a forensic pathologist who testified for the State in a capital sentencing proceeding, the trial court did not err when, in its discretion, it ordered the State to instruct this witness to prepare a written report, ordered the State to provide defendant with a copy of that report, and postponed the witness's testimony until the next day so that defendant could adequately prepare. N.C.G.S. § 15A-903(e).

**17. Evidence— capital sentencing—embezzlement, false pretenses, prostitution—foundation for questions**

The prosecutor was not improperly permitted to ask unfounded questions to a witness in a capital sentencing proceeding concerning whether he had knowledge of defendant's involvement in an embezzlement scheme, defendant's receipt of money for uncompleted construction jobs, or defendant's prostituting women at his residence where the witness denied knowledge of these matters, but subsequent witnesses testified about

the embezzlement scheme and about defendant's taking money and not completing construction projects, and defendant's daughter had testified previously about the prostitution at defendant's house.

**18. Evidence— capital sentencing—cross-examination—impeachment—good faith questions—rebuttal of mitigating circumstances**

The prosecutor's cross-examination of defendant's sister in a capital sentencing proceeding concerning whether she talked to others about defendant being violent was properly permitted to impeach the witness's direct testimony that defendant was not violent. Furthermore, the prosecutor's question as to whether this witness had heard that defendant inappropriately touched her niece's minor daughter was asked in good faith where the witness responded that she had heard about the inappropriate touching and the same evidence had been admitted previously, and this question was proper to rebut one or more of the submitted mitigating circumstances.

**19. Appeal and Error— objection sustained—question answered—motion to strike—request for curative instruction**

When the trial court sustains an objection to a question but the witness nonetheless answers the question, the objecting party has no basis for appeal absent a motion to strike or a request for a curative instruction.

**20. Evidence— hearsay—embezzlement scheme—admission for nonhearsay purpose**

Testimony elicited from a witness concerning an alleged embezzlement scheme was not hearsay since it was not admitted for the truth of the matter asserted but was admitted to explain the discrepancy between the witness's earlier statements to the police and his trial testimony.

**21. Evidence— affirmative answers to questions—questions not unfounded**

The prosecutor did not ask unfounded questions based on hearsay rumors about the reasons why defendant's day-care center was closed down when the witnesses responded affirmatively to those questions.

STATE v. FLEMING

[350 N.C. 109 (1999)]

**22. Homicide— first-degree murder—defendant as perpetrator—sufficient evidence**

The State's evidence was sufficient to prove that defendant was the perpetrator of a first-degree murder where it tended to show that the victim was the prosecuting witness against defendant in an uttering forged checks case scheduled for trial approximately one week after the murder occurred; the victim's assailant entered the victim's house and repeatedly hit the victim on the head as the victim tried to escape, leaving a trail of blood-spatter marks leading from the den, into the kitchen, and down the main hallway; the assailant then manually strangled the victim while the victim unsuccessfully attempted to defend himself; defendant's watch and a shoe impression that matched defendant's shoe were found at the crime scene; and while the watch and shoe impression were not discovered until three days after the scene was initially examined, they were present in photographs taken at the initial examination.

**23. Appeal and Error— preservation of issues—constitutionality of review standard—failure to raise in trial court**

Defendant's contention that the standard of review which allows the appellate court to consider incompetent evidence to defeat a motion to dismiss violates defendant's constitutional right against double jeopardy will not be considered on appeal where defendant did not raise this issue in the trial court; furthermore, the appellate court has not determined that incompetent evidence was admitted or relied on by the trial court in ruling on defendant's motion to dismiss.

**24. Criminal Law— prosecutor's closing argument—inferences supported by evidence**

Where the evidence in a first-degree murder case showed that defendant had a key to the murder victim's post office box, the prosecutor's jury argument that if defendant has "a mail box key, he's probably got a house key" was a reasonable inference based on the evidence; moreover, whether defendant had a key was not significant since the evidence showed that defendant could gain access to the victim's house through a sliding door without a key. Also, the prosecutor's argument that defendant used a hammer to assault the victim was a reasonable inference to be drawn from evidence that an autopsy revealed both round and claw-shaped marks on the victim's head and that defendant possessed at least two claw hammers.

**25. Criminal Law— prosecutor's closing argument—capital sentencing—statements supported by evidence, not grossly improper**

The prosecutor's argument in a capital sentencing proceeding that defendant "was making a thousand dollars a week sometimes off of each girl" was supported by testimony of the victim's daughter that she would in fact generate a thousand dollars a week in prostitution and illegal drugs for defendant. Further, the prosecutor's argument that defendant told the victim that he would die on the day defendant murdered him was not so grossly improper as to require the trial court to intervene ex mero motu.

**26. Criminal Law— prosecutor's closing argument—capital sentencing—defense counsel's reaction to witness—no gross impropriety**

The prosecutor's statement in his closing argument in a capital sentencing proceeding that he thought defense counsel "was going to kill" defendant's ex-wife was not meant literally but was meant to imply that defense counsel's reaction to the ex-wife's demeanor and lack of responsiveness when defense counsel asked whether she knew defendant during the time of his first wife's death were damaging to defendant's case; therefore, the statement was not so grossly improper as to require intervention by the trial court ex mero motu.

**27. Criminal Law— prosecutor's closing argument—capital sentencing—defense witnesses—Alzheimer's disease**

The prosecutor's analogy to Alzheimer's disease when referring to the 180-degree turnaround in the evidence presented by defendant's witnesses was not prejudicial to defendant.

**28. Criminal Law— prosecutor's closing argument—capital sentencing—payment of expert—no gross impropriety**

Assuming arguendo that the prosecutor's argument in a capital sentencing proceeding that defendant's expert witness was being paid to give favorable testimony was improper, it did not entitle defendant to a new sentencing proceeding.

**29. Criminal Law— prosecutor's closing argument—capital sentencing—discrediting family relationship—no impropriety**

The prosecutor's closing argument attempting to discredit defendant's evidence that he had a loving relationship with his

family was proper during a capital sentencing proceeding which focused on defendant's character.

## 30. Criminal Law— death penalty not disproportionate

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in other cases considering both the crime and the defendant where defendant was convicted on the basis of premeditation and deliberation; the jury found as aggravating circumstances (1) that the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, and (2) that the murder was especially heinous, atrocious, or cruel; the evidence showed multiple blunt-force injuries to the head of the victim, multiple defensive wounds to the victim's arms and leg, and manual strangulation to death; the evidence of the defensive wounds and the amount of time required for fatal strangulation indicated that the victim suffered before he died and that he was aware of but unable to prevent his impending death; defendant's motive for killing the victim was that the victim was to testify against defendant in a criminal prosecution; and no evidence in the case suggests that defendant sought medical help for the victim.

Justices MARTIN and WAINWRIGHT did not participate in the consideration or decision of this opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Grant (Cy A.), J., on 8 April 1997 in Superior Court, Northampton County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 16 November 1998.

*Michael F. Easley, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Elizabeth G. McCrodden for defendant-appellant.*

PARKER, Justice.

Defendant John Henry Fleming was indicted on 23 September 1996 for the first-degree murder of Genie Pelham ("victim"). Defendant was tried capitally and found guilty of first-degree murder on the basis of premeditation and deliberation. Following a capital-sentencing proceeding, the jury recommended a sentence of death; and the trial court entered judgment accordingly.

The State's evidence at trial tended to show the following. On or about 17 May 1996, defendant entered the home of the victim and assaulted him with a blunt object. Based upon the blood-spatter marks found at the crime scene, Anthony Jernigan, a special agent with the State Bureau of Investigation ("SBI") and a crime-scene specialist, concluded that the assault began in the victim's den. The victim moved from the middle of the love seat to the north end of the love seat. While the assault continued, the victim moved from the den, to the kitchen, and finally to the main hallway. Judging from the level of the blood-spatter marks, the victim rose and fell approximately six different times as his assailant hit him on the head. Defendant's black watch and a shoe impression matching defendant's unique shoe imprint were found at the scene of the crime.

The autopsy revealed over a dozen contusions and lacerations on the victim's head. The forensic pathologists also found abrasions on the victim's neck, arms, and right leg. The injuries to the victim's arms and shin may have been defensive wounds. Additionally, the left side of the victim's hyoid bone, which is found at the base of the tongue, was broken. The cause of death was strangulation with the hand or hands. This conclusion was consistent with the fingernail marks found on the victim's neck, the hemorrhage into the tissues underneath the skin of the neck, and the fracture and hemorrhage of the hyoid bone.

At the time of the murder, defendant and Eugenia Pelham, the victim's daughter, were having a relationship; the victim did not approve of this relationship. The victim also intended to be a prosecuting witness against defendant for three counts of uttering forged checks on the victim's bank account. Defendant's uttering trial was scheduled for 23 May 1996.

Defendant presented no evidence at the guilt-innocence phase.

Additional facts will be presented as necessary to discuss specific issues.

## PRETRIAL ISSUES

[1] By his first assignment of error, defendant contends that the trial court erred in denying his motion to prohibit the use of the aggravating circumstance that the victim's murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (1997). Defendant argues, *inter alia,* that the (e)(9) aggravating circumstance is unconstitutionally vague and overbroad and that, based on the evidence

presented at trial, its submission was unwarranted. For the following reasons we disagree.

As to defendant's first argument, we have repeatedly rejected the contention that N.C.G.S. § 15A-2000(e)(9) is unconstitutional for being overbroad or vague. *See State v. Gray*, 347 N.C. 143, 189-90, 491 S.E.2d 538, 560 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 486 (1998); *see also State v. Syriani*, 333 N.C. 350, 391-92, 428 S.E.2d 118, 141, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

Further, whether a trial court properly submitted the (e)(9) aggravating circumstance depends on the facts of the case. *State v. Gibbs*, 335 N.C. 1, 61, 436 S.E.2d 321, 356 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). We have stated that the (e)(9) aggravating circumstance is appropriate "when the murder in question is conscienceless, pitiless, or unnecessarily torturous to the victim." *State v. Kandies*, 342 N.C. 419, 450, 467 S.E.2d 67, 84, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). In determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravating circumstance, we must consider the evidence in the light most favorable to the State; and the State is entitled to every reasonable inference to be drawn therefrom. *See, e.g., State v. Flippen*, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998).

Applying these principles in this case, we conclude that the evidence was sufficient to support submission of the (e)(9) aggravating circumstance. Here, the State's evidence tended to show that the victim was repeatedly assaulted with a blunt object in his own home. As the victim struggled to defend himself, defendant continued to hit him on the head as the victim moved from the den, through the kitchen, and into the main hallway. The victim had multiple cuts and bruises on his head, arms, and right leg. Defendant also manually strangled the victim to the point where his hyoid bone was fractured.

The forensic pathologists testified that the repeated blows to the victim's head did not render the victim unconscious. Defendant then applied so much pressure to the victim's neck that blood could not reach his brain. At this point the victim lost consciousness, his brain lost its ability to function, he stopped breathing, his heart stopped beating, and he ultimately died of cardiac arrest. One of the forensic pathologists testified that it would take approximately two minutes or more for a strangling victim to lose consciousness.

We hold that this evidence, when viewed in the light most favorable to the State, was sufficient to support a reasonable inference that the victim remained conscious during his ordeal and suffered great physical pain and torture as, already bloodied and bruised from the beatings, he was strangled so forcefully that his neck was repeatedly scratched. *See State v. Artis*, 325 N.C. 278, 320, 384 S.E.2d 470, 494 (1989) (holding that the (e)(9) aggravating circumstance was properly submitted where strangulation victim physically and psychologically suffered), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). This assignment of error is overruled.

## JURY SELECTION

Next, defendant argues that the trial court erred in denying his motion for individual *voir dire* and sequestration of jurors during *voir dire* and that the *voir dire* process under N.C.G.S. § 15A-1214(d) through (f) was unconstitutional.

"In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1997). Whether to grant sequestration and individual *voir dire* of prospective jurors rests within the trial court's discretion and will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Atkins*, 349 N.C. 62, 105-06, 505 S.E.2d 97, 123 (1998).

[2] Defendant's sole argument in support of abuse of the trial court's discretion in refusing to permit individual *voir dire* or sequestration during *voir dire* is that prospective jurors who were unwilling to serve as jurors did not truthfully answer questions during *voir dire*. A careful review of the transcript does not reveal that prospective jurors misled the court in order to avoid jury duty. Of the three prospective jurors defendant now claims may have been less than candid, one was excused because he knew the victim's family; and the other two were excused because they unequivocally stated that they could not recommend the death penalty based on their personal and religious beliefs. Defendant does not allege there is any indication, and we detect no such indication, that the prospective jurors were not telling the truth during *voir dire*. Therefore, defendant's argument that the denial of his motion has harmed him is dismissed.

Defendant further argues that, as a direct result of the statutory process under N.C.G.S. § 15A-1214(d) through (f), his constitu-

tional rights were violated. N.C.G.S. § 15A-1214 provides, in pertinent part:

> (d) The prosecutor must conduct his examination of the first 12 jurors seated and make his challenges for cause and exercise his peremptory challenges. If the judge allows a challenge for cause, or if a peremptory challenge is exercised, the clerk must immediately call a replacement into the box. When the prosecu-·tor is satisfied with the 12 in the box, they must then be tendered to the defendant. Until the prosecutor indicates his satisfaction, he may make a challenge for cause or exercise a peremptory challenge to strike any juror, whether an original or replacement juror.

> (e) Each defendant must then conduct his examination of the jurors tendered him, making his challenges for cause and his peremptory challenges. If a juror is excused, no replacement may be called until all defendants have indicated satisfaction with those remaining, at which time the clerk must call replacements for the jurors excused. The judge in his discretion must determine order of examination among multiple defendants.

> (f) Upon the calling of replacement jurors, the prosecutor must examine the replacement jurors and indicate satisfaction with a completed panel of 12 before the replacement jurors are tendered to a defendant. Only replacement jurors may be examined and challenged. This procedure is repeated until all parties have accepted 12 jurors.

[3] First, defendant argues that this process created a confusing method of questioning prospective jurors since the questioning of prospective jurors skipped from one juror to another. As a result prospective juror Brenda Jordan was called to juror seat number ten, but she was never excused or seated as a juror; and a Mr. Reeves was polled as a juror at the guilt-innocence phase, but there was no *voir dire* of Mr. Reeves. While we find it troublesome that the record reveals that Ms. Jordan was called as a prospective juror and that Mr. Reeves was polled at the conclusion of the guilt-innocence phase, we must reject defendant's argument.

Defendant concedes that the trial court followed the statutory procedure for jury selection pursuant to N.C.G.S. § 15A-1214(d) through (f). After the prosecutor passed twelve prospective jurors to defendant, pursuant to N.C.G.S. § 15A-1214(d), defendant excused,

either peremptorily or for cause, eight of these prospective jurors, pursuant to N.C.G.S. § 15A-1214(e). Therefore, eight seats remained to be filled; however, the courtroom clerk mistakenly called nine people, including Brenda Jordan to fill seat number ten, which was already occupied by juror Donnie Smith. The record discloses no *voir dire* of Ms. Jordan; thus, we can only conclude that Ms. Jordan was never seated as a prospective juror, and defendant cannot demonstrate any harm. Regarding the alleged sudden appearance of Mr. Reeves, while it is impossible to discern whether the courtroom clerk merely misspoke when polling the jury during the guilt-innocence phase or whether the transcript contains an error, *see State v. DeCastro*, 342 N.C. 667, 698, 467 S.E.2d 653, 669, *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996), defendant has not been prejudiced.

[4] Further, defendant argues on appeal that the statutory scheme detailed in N.C.G.S. § 15A-1214(d) through (f) is unconstitutional because it allows the prosecutor a larger pool of prospective jurors to select from than defendant. However, defendant did not raise this constitutional issue at trial; consequently, the trial court did not have the opportunity to consider or rule on this issue. N.C. R. App. P. 10(b)(1). Therefore, defendant has failed to preserve this assignment of error for appellate review. *See State v. Flippen*, 349 N.C. at 276, 506 S.E.2d at 709-10 (holding that defendant's failure to raise a constitutional issue at trial waived appellate review of that issue); *State v. Frye*, 341 N.C. 470, 493, 461 S.E.2d 664, 675 (1995) (same), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996); *State v. King*, 342 N.C. 357, 364, 464 S.E.2d 288, 293 (1995) (same). These assignments of error are overruled.

Next, defendant assigns error to the trial court's allowing defendant to be tried without first making the jurors take an oath to be truthful during *voir dire*. The jurors were properly sworn pursuant to N.C.G.S. § 9-14 and affirmatively responded when the courtroom clerk administered the following oath: "Do you solemnly swear that you will truthfully, without prejudice or partiality, try all issues and criminal actions that come before you and give true verdicts according to the evidence, so help you God?" Defendant nonetheless argues that the failure to require prospective jurors to swear to tell the truth during *voir dire* tainted his trial. Defendant, however, did not object to any lack of oath during *voir dire*. Thus, this assignment of error is likewise not preserved for appellate review and is accordingly overruled. *See* N.C. R. App. P. 10(b)(1); *State v. Flippen*, 349 N.C. at 276, 506 S.E.2d at 709-10.

STATE v. FLEMING

[350 N.C. 109 (1999)]

**[5]** Next, defendant contends that the trial court erred in denying his motion to permit defense counsel to question prospective jurors challenged for cause by the State. Defendant argues that he should have been afforded an opportunity to rehabilitate prospective jurors Foreman and Joyner when the State challenged them for cause based upon their opposition to the death penalty.

The *voir dire* of prospective juror Foreman follows:

Q. [PROSECUTOR] Before yesterday had you ever thought about the death penalty, ever considered the death penalty before yesterday?

A. [JUROR] No.

Q. Do you have personal or religious feelings concerning the death penalty?

A. Yes.

Q. Are those strong feelings that you have for the death penalty?

A. Yes.

Q. Are they personal and religious?

A. Yes.

Q. Because of your strong personal and religious feelings with respect to the death penalty, would you, yourself, be able to recommend or vote for the death penalty?

A. No.

Q. Knowing the court would follow your vote and impose the death penalty?

A. No.

Q. So regardless of what the circumstances might be or the facts might be in the case, you would be unable to recommend the death penalty for anyone under any circumstances; is that correct?

A. Yes.

Q. That's based upon your own personal beliefs and religious beliefs?

A. Right.

Q. So regardless of what the law is and the evidence might be in the case, you would not recommend the death penalty for anyone under any circumstances?

A. No.

Q. Is that correct?

A. Yes.

The State challenged prospective juror Foreman for cause, and defendant objected and requested an opportunity to rehabilitate. The trial judge overruled the objection and excused Mr. Foreman pursuant to N.C.G.S. § 15A-1212(8), which provides that a juror may be challenged for his inability to render a verdict in accordance with the laws of the State. Similarly, prospective juror Joyner stated her inability to recommend the death penalty based on her personal or religious feelings, was challenged for cause, and was excused under N.C.G.S. § 15A-1212(8).

The trial court retains discretion as to the extent and manner of questioning, and its rulings on a challenge for cause will not be overturned absent a showing of abuse of discretion. *See State v. Atkins*, 349 N.C. at 105-06, 505 S.E.2d at 123.

> The defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. The reasoning behind this rule is clear. It prevents harassment of the prospective jurors based on their personal views toward the death penalty.

*State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). Since both prospective jurors unequivocally stated that they could not recommend the death penalty under any circumstances, we hold that the trial court did not abuse its discretion when denying defendant's request to attempt to rehabilitate these prospective jurors. This assignment of error is overruled.

[6] Next, defendant claims that the trial court erred in failing to direct the prosecutor to cease questioning prospective jurors about whether they were "strong enough" to recommend and impose the death penalty. Defendant contends that the prosecutor improperly used this question to "stake out" prospective jurors.

According to defendant, the prosecutor used the term "strong enough" forty-nine times during jury selection. After the thirty-third

time, the trial judge told the prosecutor that he was not sure that he liked the term "strong enough" and admonished the prosecutor to refrain from using it; nevertheless, the prosecutor continued to use the term "strong enough" sixteen more times during jury selection. The trial court should not permit counsel to ask questions which would tend to "stake out" the prospective jurors and cause them to pledge themselves to a future course of action. *State v. Bond,* 345 N.C. 1, 16, 478 S.E.2d 163, 170 (1996), *cert. denied,* 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). However, when read in context, the use of the term "strong enough" was not an impermissible inquiry as to the kind of verdict the prospective jurors would render or how they would be inclined to vote on a given state of facts. *See State v. Walls,* 342 N.C. 1, 38-39, 463 S.E.2d 738, 757 (1995) (holding that questions which did not attempt to elicit in advance what a juror's decision would be under a given state of facts were not stake-out questions), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). We note also that defendant did not object to these questions from the prosecutor. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

In his next assignment of error, defendant argues that the trial court's repeated prompting of the prosecutor on what questions to ask and how to ask them denied defendant his due process rights, violated Article I, Section 18 of the North Carolina Constitution, and violated N.C.G.S. § 15A-1222. Defendant has listed thirty-nine instances in support of his claim that the trial court improperly involved itself in defendant's trial. Defendant submits that, *inter alia,* the trial court repeatedly assisted the prosecutor, told him to qualify witnesses, suggested questions to aid the State's case or to avoid objections by defendant, and explained defendant's tactics. Defendant asserts that, alone or in combination, these instances violated the requirement that the trial court remain impartial and prejudiced defendant.

"The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1997). N.C.G.S. § 15A-1222 does not apply when the jury is not present for the questioning. *State v. Rogers,* 316 N.C. 203, 220, 341 S.E.2d 713, 723 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988). "The law imposes on

the trial judge the duty of absolute impartiality." *Nowell v. Neal,* 249 N.C. 516, 520, 107 S.E.2d 107, 110 (1959). The trial judge also has the duty to supervise and control a defendant's trial, including the direct and cross-examination of witnesses, to ensure fair and impartial justice for both parties. *State v. Agnew,* 294 N.C. 382, 395, 241 S.E.2d 684, 692, *cert. denied,* 439 U.S. 830, 58 L. Ed. 2d 124 (1978). "Furthermore, it is well recognized that a trial judge has a duty to question a witness in order to clarify his testimony or to elicit overlooked pertinent facts." *State v. Rogers,* 316 N.C. at 220, 341 S.E.2d at 723; *see also State v. Jackson,* 306 N.C. 642, 651, 295 S.E.2d 383, 388 (1982).

> "In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." *[State v.] Larrimore,* 340 N.C. [119,] 155, 456 S.E.2d [789,] 808 [(1995)]. "The trial court has a duty to control the examination of witnesses, both for the purpose of conserving the trial court's time and for the purpose of protecting the witness from prolonged, needless, or abusive examination." *State v. White,* 340 N.C. 264, 299, 457 S.E.2d 841, 861, *cert. denied,* [516] U.S. [994], 133 L. Ed. 2d 436 (1995). In performing this duty, however, the trial court's position as the "standard-bearer of impartiality" requires that "the trial judge must not express any opinion as to the weight to be given to or credibility of any competent evidence presented before the jury." *Larrimore,* 340 N.C. at 154-55, 456 S.E.2d at 808.

*State v. Jones,* 347 N.C. 193, 207, 491 S.E.2d 641, 649-50 (1997).

Applying these principles to the remarks of the trial court which form the basis of defendant's assignment of error and after conducting a thorough review of each alleged instance of improper conduct or questioning on the part of the trial judge, we detect no prejudicial error and reject defendant's claim of partiality. Nonetheless, we will briefly address the alleged improprieties.

[7] The first few instances of partiality defendant claims occurred were all during jury-selection bench conferences. First, the trial judge instructed the prosecutor to ask prospective jurors if they "would be unable or able" to recommend the death penalty in order to avoid confusion in the record, since it appeared to the trial judge that prospective jurors occasionally responded "No" when they meant to say "Yes." Next, the trial court instructed the prosecutor to ask whether prospective jurors believed the death penalty would be "the

right punishment or the correct thing" under certain circumstances, rather than "an appropriate punishment," to ensure that the prospective jurors understood what was being asked. Later, the prosecutor challenged a prospective juror for cause; defendant objected and requested the opportunity to rehabilitate which was allowed. During this rehabilitation, the trial judge called counsel to the bench and expressed his concern about the prospective juror's ability to be a fair and impartial juror given her feelings concerning the death penalty. The judge told defense counsel to focus on the issue of the death penalty by asking a hypothetical question and then told the prosecution that when the prospective juror was passed back to the prosecutor for more questioning, he should ask her a "why" question as to her position on the death penalty so that the judge could rule on the for-cause challenge. The prosecutor eventually used a peremptory challenge to excuse this prospective juror. Having reviewed the entire transcript of jury selection and having also found that the judge instructed defense counsel to ask certain questions, we determine that the judge was merely fulfilling his duty to ensure that a fair and impartial jury tried defendant's case.

[8] The following complained-of instances occurred during the guilt-innocence phase of defendant's trial: the trial judge asked a witness what the basis was for her opinion that defendant looked "serious" and later instructed the prosecutor to rephrase a question to prevent a potentially objectionable response from a witness. The judge informed the prosecutor that certain statements would be inadmissible; so the prosecutor rephrased his questions to restrict the witness' response. The judge admonished the prosecutor for improper comments. During a bench conference, the judge explained to the prosecutor that luminal only reacts to the heme in hemoglobin, not to animal fat. On three occasions the judge intervened *ex mero motu* to correct improper questions, once to explain in a bench conference why the question was improper and twice to rephrase a question. Several times the judge explained why he sustained or overruled defense counsel's objections. On two occasions the prosecutor had to rephrase his questions—the latter instance was based on hearsay which the judge subsequently ruled was not hearsay, explaining why it was not to defense counsel in a bench conference. At another point the judge sustained defendant's objection and during the ensuing bench conference suggested how the question could be rephrased. On another occasion after two objections by defense counsel, the judge rephrased the question for the prosecutor. The judge inter-

vened to conserve the court's time and avoid having the prosecutor ask the witness a long stream of questions about where in the kitchen blood was discovered. During *voir dire* of a witness, the judge intervened to avoid wasting time and later directed the prosecutor to ask certain questions for the judge's own understanding. The judge twice told the prosecutor that a witness needed to be qualified as an expert before giving an opinion; however, the prosecutor had not yet questioned either witness regarding an opinion. The judge directed the prosecutor to ask a clarifying question regarding evidence pertaining to the victim's shoes. On another occasion, the judge instructed the prosecutor to ask the witness what Eugenia Pelham had said about the black watch. During *voir dire* of a witness, the judge ruled that any reference to the fact that defense counsel, during the jury view, had perhaps found and moved the buckle from the black watch would be inadmissible as unfairly prejudicial to defendant and warned the prosecutor to prevent his witness from testifying to that fact. The judge limited the prosecutor's redirect examination of Deputy Mason concerning his conversation with the assistant commonwealth attorney in Virginia. At one point the judge interrupted the prosecutor and asked a witness ten questions, without objection from either party, regarding his qualifications as an expert; the record indicates that it was nearly time for the court to recess for the evening and that in order to have any meaningful examination prior to recessing, the judge decided to quickly qualify the witness as an expert. The prosecutor asked a leading question to which defense counsel did not object, but the judge intervened anyway and instructed the prosecutor on the proper form of the questions. At another point the judge sustained an objection and suggested how the prosecutor should rephrase the question; it was later discovered that defense counsel's objection was not based on the form of the question, and the objection was ultimately sustained based on relevancy.

From our review of the transcript, we note that in multiple instances the trial judge also interjected his own questioning while defense counsel was examining witnesses, interrupted defense counsel's questioning to clarify a witness' testimony, and instructed defense counsel to ask his witness certain questions during witness examinations.

Defendant cites eight further instances which occurred at his sentencing. In the first instance defendant contends that the trial judge improperly told the prosecutor how to argue against a mitigat-

**STATE v. FLEMING**

[350 N.C. 109 (1999)]

ing circumstance; however, our review reveals a dialogue between the judge and the prosecutor about whether the prosecutor *would be able to* argue, not *how to* argue, against a mitigating circumstance. Next, defendant contends that the judge improperly told the prosecutor how to avoid a hearsay objection; but the transcript discloses that the judge overruled the objection and explained his reasons for doing so. Later, during a bench conference, the trial judge told the prosecutor to ask the witness what his definition of torture was. This direction was not improper since the witness' understanding of the term and the prosecutor's understanding were obviously different. Defendant also complains about the trial court's telling the prosecutor to bring a witness back to the stand to make his point; however, the judge merely explained that in order for the corroborating testimony to be admissible, the prosecutor might need to recall a witness; the judge then overruled defense counsel's objection. Defendant also argues that on two occasions, the trial judge told the prosecutor how to ask certain questions. The transcript reveals that the judge was merely attempting to clarify the witness' testimony. Next, defendant notes that the trial judge initiated his own questioning of the witness; the judge, however, felt that these questions were necessary for the jury to understand why the earlier testimony had been elicited. Finally, defendant notes that the trial judge instructed the prosecutor to tie the witness' illegal actions to defendant. Once again defendant never objected to the testimony, which was otherwise irrelevant if not tied to defendant.

Having reviewed the portions of the transcript to which defendant assigns error, we conclude that the trial judge conducted defendant's guilt-innocence phase and sentencing proceeding in an impartial manner and made every effort to ensure that defendant received a fair trial. *State v. Heatwole*, 344 N.C. 1, 28, 473 S.E.2d 310, 324 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). Further, we note that the trial judge properly instructed the jury at both the guilt-innocence and the sentencing proceedings that the law requires the presiding judge to be impartial and that it should not draw any inferences from his rulings, questions, or anything else he might have said or done.

We recognize that in an ideal trial no occasion would arise which would prompt the trial judge to ask questions of a witness for clarification and understanding of the testimony. But as this Court stated in *Andrews v. Andrews*, "[t]he comment made or the question propounded should be considered in the light of all the facts and atten-

dant circumstances disclosed by the record, and unless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless." 243 N.C. 779, 781, 92 S.E.2d 180, 181 (1956). The instances cited by defendant might give the appearance of improper assistance to the prosecution but are not sufficient to have had a prejudicial effect, especially in light of the fact that the judge aided both sides in, *inter alia*, formulating questions. Accordingly, defendant's assignment of error is overruled.

Next, defendant contends that the trial court erred in refusing to allow defendant to question certain witnesses regarding specific issues.

[9] First, defendant argues that he should have been allowed to cross-examine the Virginia prosecutor about the strength of Virginia's case against defendant. According to the State's theory, defendant's motive for murdering the victim was that the victim was the prosecuting witness in a Virginia trial in which defendant was charged with uttering forged checks belonging to the victim. During *voir dire* the Virginia prosecutor testified that he thought that the Commonwealth's case against defendant on the uttering charges was weak. Defendant asserts that this evidence was relevant and should have been admitted to rebut the State's theory of defendant's motive.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Evidence is "relevant when it reveals a circumstance surrounding one of the parties and is necessary to understand properly their conduct or motives or if it allows the jury to draw a reasonable inference as to a disputed fact." *State v. Gary*, 348 N.C. 510, 520, 501 S.E.2d 57, 64 (1998). In this case, however, the testimony proffered by defendant does not go to prove the existence of any fact of consequence in the determination of his guilt. *See State v. York*, 347 N.C. 79, 95, 489 S.E.2d 380, 389 (1997). The trial court properly ruled that the evidence concerning the Virginia prosecution was relevant only as to "whether or not [defendant] believed he had committed a criminal act or whether he was likely subject to being found guilty and imprisoned for that criminal act, even if the [Virginia] prosecutor now states" that he does not think that defendant committed a criminal act. Thus, testimony concerning the merits, or lack thereof, of the Commonwealth's case against defendant was

irrelevant and properly excluded. *See* N.C.G.S. § 8C-1, Rule 402 (1992) (stating that evidence that is not relevant is not admissible).

Second, defendant claims that he should have been permitted to question Annie Clemonts regarding the victim's alleged sexual acts with the victim's daughter and granddaughter. Defendant asserts that this evidence was relevant to counter the victim's granddaughter's sentencing testimony concerning the impact of her grandfather's death. Defendant claims that the trial court excluded the evidence based on the prosecutor's contention that the evidence was untrue. However, the transcript discloses that the trial court did not in fact prohibit defense counsel from asking these questions. Instead, the trial court informed defense counsel that if he elicited these statements from Ms. Clemonts, the State then would be permitted to question Ms. Clemonts regarding the circumstances surrounding these statements, which the trial court suggested would be detrimental to defendant's case. Defendant and defense counsel presumably agreed since defense counsel did not pursue this line of questioning. Thus, this assignment of error is overruled. *See State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991) ("This Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal.").

[10] Defendant next argues that the trial court erred in allowing the State to introduce State's exhibit S-2, a black watch found at the crime scene.

Before real evidence may be received into evidence, the party offering the evidence must first satisfy a two-pronged test. "The item offered must be identified as being the same object involved in the incident and it must be shown that the object has undergone no material change." *State v. Campbell*, 311 N.C. 386, 388, 317 S.E.2d 391, 392 (1984). Determining the standard of certainty required to show that the item offered is the same as the item involved in the incident and that it is in an unchanged condition lies within the trial court's sound discretion. *Id.* at 388-89, 317 S.E.2d at 392. "A detailed chain of custody need be established only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been altered." *Id.* at 389, 317 S.E.2d at 392. Any weak links in the chain of custody pertain only to the weight to be given to the evidence and not to its admissibility. *Id.*

Defendant notes that the crime scene was initially searched on 17 May 1997, but the watch was not discovered until 20 May 1997.

During this interval the crime scene was not secured because the back door did not lock. Moreover, the buckle which was initially on the watch was not on the watch at trial thus suggesting that the watch had been altered.

We first note that defendant failed to object to the admission of the watch. Therefore, defendant has failed to properly preserve his right to appellate review. *See* N.C. R. App. P. 10(b)(1). Since this issue was not preserved for appeal, we may review it only for plain error. *State v. Allen*, 339 N.C. 545, 555, 453 S.E.2d 150, 155 (1995), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396. This Court has chosen to review such "unpreserved issues for plain error when Rule 10(c)(4) of the Rules of Appellate Procedure has been complied with and when the issue involves either errors in the trial judge's instructions to the jury or rulings on the admissibility of evidence." *State v. Cummings*, 346 N.C. 291, 313-14, 488 S.E.2d 550, 563 (1997), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 873 (1998). Plain error exists where, after reviewing the entire record, the claimed error is so fundamental, so basic, so prejudicial, or so lacking in its elements that justice could not have been done. *State v. Davis*, 349 N.C. 1, 29, 506 S.E.2d 455, 470 (1998).

In this case several witnesses testified that the watch admitted into evidence was the same watch found at the crime scene and that it was defendant's watch. The watch was also present in photographs taken during the 17 May 1997 search. Further, except for its having been cleaned up and having the buckle removed, Bernard Mason of the Northampton County Sheriff's Department testified that the watch was in the same condition as when it was found. Mason further testified that he maintained custody over the watch until it was transported to the SBI lab. Defendant made no showing that the watch admitted into evidence was not the watch found at the scene of the crime; and any alleged weakness in the chain of custody affected merely the weight, not the admissibility, of the watch. Therefore, we hold that the trial court did not commit plain error by admitting the watch into evidence.

Defendant further argues that the trial court erred by admitting a kitchen tile which allegedly contained an impression of defendant's shoe. Defendant argues that because the crime scene had been unsecured, the tile lacked reliability and should have been excluded. Again, we note that defendant did not object to the tile's admission at trial. Normally, we would review this evidentiary matter for plain

error; however, defendant failed to contend specifically and distinctly that this issue amounted to plain error as required by Rule 10(b)(4). Therefore, defendant has waived plain error review; and we must overrule this assignment of error.

By his next assignment of error, defendant contends that the trial court committed plain error in allowing and instructing the prosecutor to prompt his witnesses after the witnesses had taken the stand thereby violating defendant's due process rights.

[11] Defendant's first argument is that during the prosecutor's *voir dire* of Mason, the prosecutor asked the trial court's permission to talk to Mason and the trial court recessed for eighteen minutes. Defendant maintains that the trial court was allowing the prosecutor an opportunity to prompt his witness.

Again, we must acknowledge defendant's failure to raise this issue during his trial, thus constituting waiver pursuant to Rule 10(b)(2). Further, we have applied the plain error rule only to jury instructions and evidentiary matters, *State v. Atkins*, 349 N.C. at 81, 505 S.E.2d at 109, and decline to extend application of the plain error rule to this situation. However, a review of the transcript of Mason's *voir dire* testimony reveals no impropriety on the part of the prosecutor or the trial court. During the *voir dire* the trial court interrupted the questioning and conducted a bench conference to inquire how the prosecutor intended to handle the discovery of the clasp from the black watch. After further *voir dire* and discussion the trial court determined that it would not let Mason testify as to who pointed the clasp out to him. At that point the prosecutor asked to talk with the witness. The trial judge said, "He's not to say anything about Mr. Reaves or Mr. Barnes, whatever he says. We'll take fifteen minutes." The only logical conclusion that may be drawn is that the recess was used by the prosecutor to ensure that the witness adhered to the trial court's instruction not to mention the fact that defense counsel may have discovered and moved the watch's buckle during the jury view of the crime scene. In context the thrust of the trial court's comments in the bench conference was to prevent any unfair prejudice to defendant. Whether to permit a recess was within the sound discretion of the trial judge, and the trial judge did not abuse his discretion.

Defendant argues that the trial court also allowed the prosecutor a chance to prompt one of his sentencing witnesses. During cross-examination defense counsel asked Dr. Gilliland to read a portion of

a book on forensic pathology. The prosecutor objected on the grounds that the book was not in evidence and that the witness was asked to read only a portion of a book that she had not previously read. The court informed the prosecutor that defense counsel's line of questioning was proper, decided to take a fifteen-minute recess, told the prosecutor to instruct the witness to answer, and assured the prosecutor that the witness could clarify her testimony on redirect examination. Whether to take a recess was in the trial court's sound discretion, and defendant has failed to show how he was prejudiced by the trial court's action in calling the recess. Accordingly, this assignment of error is dismissed.

[12] Defendant next contends that the trial court erred in allowing the State's motion for a jury view of the crime scene. Defendant argues that the crime scene was never secured, that evidence there could have been tampered with, and thus that the trial court abused its discretion in allowing the jury view. Defendant further suggests that the trial court should have inquired, *sua sponte*, about the security of the scene of the crime.

N.C.G.S. § 15A-1229(a) provides that the decision to permit a jury view lies within the discretion of the trial court. The decision will not be disturbed absent an abuse of that discretion. *State v. Tucker*, 347 N.C. 235, 240, 490 S.E.2d 559, 561 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 649 (1998). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985).

In this case defendant's argument in support of an abuse of discretion focuses on the fact that the crime scene was not secured, that tampering may have occurred, and that the trial court, therefore, had a duty to question witnesses about this fact. We disagree. Prior to the trial court's granting a jury view, defendant argued that there was only a piece of law-enforcement crime-scene yellow tape securing the back porch and that tampering was a possibility. Thus, the trial court was fully informed of all relevant facts and considered defendant's arguments when making its decision to permit the jury view. Accordingly, the trial court did not abuse its discretion; and this assignment is overruled.

[13] By his next assignment of error, defendant argues that the trial court erred in failing to control the trial in such a manner that defendant would receive effective appellate review. Specifically, he con-

tends that on seven occasions, the transcript of defendant's trial is so confusing as to render impossible appellate review of the evidence against defendant.

The first portion of the transcript about which defendant complains occurred during the prosecutor's opening statement. Referring to pictures, the prosecutor informed the jury that the State's evidence would show the layout of the victim's house and the location of blood-spatter marks and bloodstains. Defendant did not object to these statements and has thus failed to preserve his right to appellate review. N.C. R. App. P. 10(b)(1).

The remaining instances to which defendant assigns error involve the testimony of witnesses. Defendant first complains about the testimony of SBI Special Agent Anthony Jernigan. Using a photograph, Jernigan described where certain blood splotches were located; he also drew their location on a board. Next defendant raises the testimony of Deputy Mason. Mason testified, with the assistance of a photograph, about an impression found on a kitchen tile which matched defendant's shoe. Later, Mason testified, with the aid of a photograph and a diagram, about the location of the watch and the watch buckle. The final three references concern SBI Special Agent Joyce Petzka's testimony. Using various State's exhibits, Petzka explained to the jury why the impression on the kitchen tile was identical to defendant's shoe. Some of the exhibits used during these portions of the trial were admitted into evidence.

In order to prevent any alleged confusion in the transcript, defendant had an opportunity at trial to request that the witnesses mark on the exhibits as they testified. Defendant did not do so. Further, our reading of the transcript does not yield the level of confusion that defendant alleges. The exhibits which were admitted into evidence are available for review by this Court and speak for themselves as to the blood spatters, black watch, and the shoe imprints. This assignment of error is overruled.

[14] Defendant's next contention is that the trial court erred in allowing the State's motion *in limine* to suppress evidence concerning defendant's polygraph test. Defendant contends that his submission to a polygraph test should have been admitted for the purpose of showing his cooperation with law enforcement officers. Defendant claims that the trial court erroneously excluded this evidence on the grounds of hearsay. Defendant also contends that the testimony was relevant to show a consciousness of innocence in the same

way evidence of flight is relevant to show a defendant's consciousness of guilt.

We have previously held "that in North Carolina, polygraph evidence is no longer admissible in any trial." *State v. Grier*, 307 N.C. 628, 645, 300 S.E.2d 351, 361 (1983); *see also State v. Jones*, 342 N.C. 457, 466, 466 S.E.2d 696, 700, *cert. denied*, 518 U.S. 1010, 135 L. Ed. 2d 1058 (1996); *State v. Mitchell*, 328 N.C. 705, 711, 403 S.E.2d 287, 291 (1991). Moreover, the record discloses that defendant was permitted to introduce testimony regarding his cooperation with law enforcement officers. Additionally, the trial court did not exclude the evidence based on hearsay; instead, it properly ruled that polygraph evidence was irrelevant. Defendant's reliance on *State v. Mitchell*, 328 N.C. 705, 403 S.E.2d 287 (1991) and *State v. Harris*, 323 N.C. 112, 371 S.E.2d 689 (1988) is misplaced in that the procedural posture in which the polygraph issue arose in those cases distinguishes them from this case. In *Mitchell* and *Harris* a witness actually mentioned taking a polygraph or requesting codefendants to take a polygraph. This Court did not approve such testimony, but concluded, based on the record before it, that the error, if any, was not prejudicial. In this case, the trial court allowed the State's motion *in limine* to preclude the testimony. Defendant has presented us with no compelling reason to alter our long-standing holdings that evidence concerning polygraph testing is inadmissible. Thus, we find no merit to this assignment of error.

[15] Next, defendant argues that the trial judge erroneously challenged defendant to take the witness stand. During a discussion among the trial judge, defense counsel, and the prosecutor outside the jury's presence over whether to permit evidence of defendant's polygraph test, the trial judge considered whether defendant's statement that he agreed to submit to a polygraph test was hearsay. The trial judge then said to defense counsel, "Fine. Call him. And let him say that he agreed to take the polygraph test. I'm being facetious about that, but that's the only way, it appears to me, it can come in." Defendant submits that this statement put pressure on defendant to take the stand and was another example of the trial court's partiality against defendant. We disagree.

After conducting more research and hearing further arguments on the issue, the trial judge ruled that the polygraph evidence was not hearsay but that it was inadmissible on relevancy grounds. We are not convinced that this statement exerted pressure on defendant to testify particularly since defendant did not take the stand during the

guilt-innocence phase. Likewise, this statement, which was admittedly facetious, does not support a claim that the judge was not impartial. Therefore, we reject defendant's contention.

## SENTENCING PROCEEDING

Next, defendant contends that the trial court erred in denying his motion to be apprised of which aggravating circumstances apply and in allowing evidence for which defendant could not prepare.

Defendant concedes that this Court has held that the State is not required to supply a list of the aggravating circumstances it intends to use against defendant. *See, e.g., State v. McLaughlin*, 323 N.C. 68, 84, 372 S.E.2d 49, 61 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990). The reasoning behind this holding is that N.C.G.S. § 15A-2000(e) lists the only eleven circumstances which may be used in aggravation; thus, the statute provides sufficient notice. *Id.* However, defendant contends that the reasoning is unsupported in this case because (i) defendant did not receive a copy of a report from Dr. M.G.F. Gilliland, the State's expert witness, prior to trial or within sufficient time for preparation; and (ii) the State introduced evidence of additional factors beyond those listed in N.C.G.S. § 15A-2000(e) to aggravate defendant's sentence.

[16] During the sentencing proceeding, the State called Dr. Gilliland, a forensic pathologist, to testify about, *inter alia,* the victim's wounds and the pain and suffering that these wounds might have caused. Dr. Gilliland had not previously prepared a written report concerning her expert opinion. Soon thereafter, a bench conference occurred in which the trial judge told the prosecutor that he previously had informed both parties that he requires that expert witnesses prepare a report within forty-eight hours of testifying. The judge then instructed the prosecutor to have Dr. Gilliland prepare a report and told him that Dr. Gilliland's testimony would be delayed until the next morning so that defendant and his counsel could review the report. Defendant submits that the judge's treatment of the State's witness is yet another instance of his partiality toward the State.

By statute the General Assembly has dictated the scope of discovery in criminal proceedings. N.C.G.S. § 15A-903 provides, in pertinent part, that

[u]pon motion of a defendant, the court must order the prosecutor to provide a copy of or to permit the defendant to inspect and

copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecutor.

N.C.G.S. § 15A-903(e) (1997). While the statute requires the State upon motion to provide defendant with written reports, nowhere does it require that such reports be made. The statute also does not specifically authorize a judge to require that a written report be prepared; however, in our view, the judge did not err by ordering Dr. Gilliland to prepare a written report in this case. *See State v. Lee*, 335 N.C. 244, 291, 439 S.E.2d 547, 572 (finding no error when trial court ordered defendant's witness to prepare a report so that the State may prepare for that witness' testimony), *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Since there is no statutory requirement that a report be made, we hold that the trial court did not err when, in its discretion, it ordered the State to instruct its witness to prepare a written report, ordered the State to provide defendant with a copy of that report, and postponed the witness' testimony until the next day so that defendant could adequately prepare.

As for defendant's argument that the State introduced evidence in aggravation, apart from what is permitted by N.C.G.S. § 15A-2000(e), defendant has chosen to address that portion of this argument more fully in his next assignment of error. Likewise, we will do the same.

Defendant next contends that the trial court erred in allowing the State to question defendant's and its own sentencing witnesses about inadmissible and prejudicial matters. Defendant sets forth a chart containing over twenty instances where he alleges that the prosecutor asked unfounded, prejudicial, or otherwise impermissible questions, thus making defendant appear to be a child molester, a violent man, the head of a prostitution ring, a co-conspirator to embezzlement, an obtainor of money through false pretenses, and an adulterer. Defendant submits that collectively the questioning constitutes plain error.

The Rules of Evidence do not apply in sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1997). Any evidence the trial court "deems relevant to sentence" may be introduced at this stage. N.C.G.S. § 15A-2000(a)(3). The State "must be permitted to present any competent, relevant evidence relating to the defendant's charac-

ter or record which will substantially support the imposition of the death penalty." *State v. Brown*, 315 N.C. 40, 61, 337 S.E.2d 808, 824 (1985) (emphasis omitted), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373. Moreover, "[t]he State may offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence." *State v. Heatwole*, 344 N.C. at 21, 473 S.E.2d at 320. The scope of cross-examination is governed by the sound discretion of the trial court and the requirement that the questions be asked in good faith. *State v. Larry*, 345 N.C. 497, 523, 481 S.E.2d 907, 922, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 234 (1997). Further, "A prosecutor's questions are presumed to be proper unless the record shows that they were asked in bad faith." *State v. Bronson*, 333 N.C. 67, 79, 423 S.E.2d 772, 779 (1992). When a prosecutor affirmatively places before the jury incompetent and prejudicial matter by injecting his own personal opinions which are neither in evidence nor admissible, an abuse of discretion may be found. *Id.* After careful review of the transcript portions cited by defendant, we reject his argument.

[17] The first alleged improper witness examination by the prosecutor involved the cross-examination of Bishop D.L. Manning. The prosecutor inquired whether the bishop had any knowledge about defendant's involvement in a scheme to embezzle money from a Shoney's restaurant, defendant's receiving money for uncompleted construction jobs, or defendant's prostituting women at his residence. Defendant's objections were overruled, and the witness denied any knowledge of these matters. Subsequent witnesses testified about the embezzlement scheme and about defendant's taking money and not completing construction projects. The victim's daughter had testified previously about the prostitution at defendant's house. Thus, the questioning was proper; and the trial court did not abuse its discretion in overruling defendant's objections.

[18] The next argument relates to the prosecutor's questioning of defendant's sister about whether she talked to others about defendant's being violent. Defendant failed to object, and the witness said she had not talked about his being violent. Since defendant failed to object to the questions of which he now complains, in applying the plain error rule, we must determine whether the trial court abused its discretion by failing to intervene *ex mero motu. See State v. Locklear*, 349 N.C. 118, 156, 505 S.E.2d 277, 299 (1998). We hold that these were proper questions attempting to impeach the witness' direct examina-

tion testimony that defendant was not violent; thus, there was no error. The witness was also asked if she had heard that defendant had inappropriately touched her niece's minor daughter, and without objection she responded that she had heard about the inappropriate touching. Further, the same evidence had been admitted previously; but defendant did not assign error to it on appeal. Not only did the prosecutor ask the question in good faith, but the question was also proper to rebut one or more of the submitted mitigating circumstances. For the same reasons, we find no error in the prosecutor's questioning the witness about whether she knew that the niece's daughter was subpoenaed to appear in court or that the witness' niece sent her daughter to Baltimore.

[19] Third, defendant contends that the cross-examination of his first cousin was improper. The prosecutor asked about the witness' knowledge of specific legal matters, namely, defendant's taking out a warrant for trespassing and filing suit for failure to pay a mortgage payment. The witness had heard about the warrant, but only heard about the other lawsuit in court; however, the civil defendant in that lawsuit previously had testified that defendant had in fact sued her. Defendant contends these statements involved hearsay; however, as already stated, the Rules of Evidence do not apply during sentencing. Again, these questions were asked in good faith; and there was no abuse of discretion. Later, this witness was asked about the inappropriate touching of the minor and about defendant's shooting a gun at someone. The witness responded that he had heard about neither incident prior to being in court. Defendant failed to object, and we hold that the trial court did not err. The witness was then asked a question regarding defendant's first wife; defendant objected, and the trial court sustained the objection. Nonetheless, the witness answered the question; and defendant did not make a motion to strike or request a curative instruction. When the trial court sustains an objection to the question, the objecting party has no basis for appeal absent a motion to strike or a request for a curative instruction. *State v. Barton*, 335 N.C. 696, 709-10, 441 S.E.2d 295, 301-02 (1994). We hold, therefore, that the trial court did not err.

Next, defendant complains about questions based on hearsay regarding defendant's prostituting women, having lawsuits filed against him, having his day-care center foreclosed, and shooting at someone. Defendant failed to object to any of these questions. Defendant has not demonstrated that the prosecutor did not have a good faith basis for asking these questions, and we hold that the trial

court did not abuse its discretion by failing to intervene *ex mero motu*. We also find no abuse of discretion when the trial court overruled hearsay objections regarding defendant's receiving money for construction projects that were never completed and about the witness' receiving complaints concerning defendant's poor construction work.

[20] Defendant also complains that the questioning of Thomas Braswell regarding the alleged scheme to embezzle from Shoney's called for hearsay. The trial court explained during a bench conference that the testimony was not hearsay since it was not being admitted for the truth of the matter asserted. Instead, the testimony was being admitted to explain the discrepancy between Braswell's earlier statements to the police and his trial testimony. We hold that the trial court properly overruled defendant's objection.

[21] Defendant further argues that questioning concerning the reasons why his day-care center was closed down was improper or prejudicial. The witness stated that defendant told him the center was closed because of a rumor that defendant was "having some type of activity with the children" but that the accusations were not found to be true "by the law." Defendant argues that the prosecutor asked unfounded questions, based on hearsay rumors; however, we cannot agree with defendant when witnesses, as in this case, responded in the affirmative. Whether taken singly or collectively, we are unconvinced that the prosecutor's questioning of the witnesses was improper, constituted abuse of the trial court's discretion, or amounted to plain error, or that defendant has suffered prejudice. Accordingly, these assignments of error are overruled.

By his next assignment of error, defendant contends that the trial court erred by denying his motion to dismiss. Defendant argues that the evidence was insufficient to support the charge of first-degree murder; he also argues that this Court's standard of review of whether a motion to dismiss was properly denied violates the Double Jeopardy Clause of the North Carolina and United States Constitutions.

[22] First, defendant argues that the State's evidence was not sufficient to prove that he was the perpetrator of the murder. He does not argue that a premeditated and deliberate murder did not take place. According to defendant the evidence was circumstantial and consisted only of hearsay statements by defendant that the victim was going to get himself killed, a black watch that defendant allegedly

possessed and that was allegedly found at the scene of the crime, and a shoe impression found on a kitchen tile that allegedly matched defendant's shoe. The watch and shoe impression were not discovered until three days after the victim's body was discovered, and in the interim the crime scene was never secured. Further, law enforcement personnel failed to conduct hair, fiber, nail clipping, or fingerprint tests because defendant had previously been in the victim's house.

When ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State; and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Lee*, 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998). The State must present substantial evidence of each element of the offense charged. *Id.* "[T]he trial court should consider all evidence actually admitted, whether competent or not, that is favorable to the State." *State v. Jones*, 342 N.C. 523, 540, 467 S.E.2d 12, 23 (1996). If the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed," *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983); however, "[i]f there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied," *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988).

In the case *sub judice*, the State's evidence proved that the victim was the prosecuting witness against defendant in an uttering forged checks case scheduled for trial approximately one week after the murder occurred. The evidence further showed that the victim's assailant entered the victim's house and repeatedly hit the victim on the head as the victim tried to escape, leaving a trail of blood-spatter marks leading from the den, into the kitchen, and down the main hallway. Then the assailant manually strangled the victim while the victim unsuccessfully attempted to defend himself. Defendant's watch and a shoe impression that identically matched defendant's shoe were also found at the crime scene. While the watch and shoe impression were not discovered until three days after the scene was initially examined, they were present in photographs taken at the initial examination. This evidence supports a reasonable inference—more than a mere suspicion or conjecture—that defendant was the perpetrator of the murder.

[23] Defendant further argues that this Court's standard of review of the trial court's denial of his motion to dismiss violates his constitutional rights against double jeopardy. He submits that allowing the appellate court to consider incompetent evidence to defeat a motion to dismiss effectively permits a defendant to be tried twice for the same crime.

We note initially that defendant did not raise the constitutionality of considering incompetent evidence on the motion to dismiss at the trial court. "[T]his Court is not required to pass upon a constitutional issue unless it affirmatively appears that the issue was raised and determined in the trial court." *State v. Wilkinson*, 344 N.C. 198, 221, 474 S.E.2d 375, 387 (1996). Moreover, based on defendant's assignments of error on appeal, we have not determined that incompetent evidence was admitted or relied on by the trial court in ruling on the motion to dismiss. This assignment of error is overruled.

Next, defendant contends that the trial court erred in allowing the State to argue highly prejudicial matters at the close of both the guilt-innocence and sentencing proceedings. Defendant argues that the examples of recklessness and impropriety in the prosecutor's argument were so numerous and so severe that the trial court's failure to intervene *ex mero motu* entitles him to a new trial or sentencing proceeding.

Trial counsel are granted wide latitude in the scope of jury argument, and control of closing arguments is in the discretion of the trial court. *State v. Locklear*, 349 N.C. at 151-52, 505 S.E.2d at 296. Also, trial counsel "may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998). Further, the context and factual circumstances surrounding the remarks must be considered. *State v. Womble*, 343 N.C. 667, 692-93, 473 S.E.2d 291, 306 (1996), *cert. denied*, 519 U.S. 1095, 136 L. Ed. 2d 719 (1997). Where defendant failed to object to the arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. at 23, 506 S.E.2d at 467. Applying these principles to the instant case, we find no error.

[24] At five separate points during his jury argument at the close of the guilt-innocence phase, according to defendant, the prosecutor's comments warranted the trial court's intervention. The first one was the prosecutor's argument that defendant had a key to the victim's house. The prosecutor argued that if defendant has "a mailbox key, he's probably got a house key." While there was no evidence that defendant had a house key, he did have a key to the victim's post office box. Therefore, that defendant probably had a house key, too, was a reasonable inference based on the evidence. Further, the victim's daughter testified that defendant showed her how to enter the victim's house through the sliding door without a key; thus, whether or not defendant had a key was not significant since the evidence showed that he could gain access to the victim's house at any time. The remaining four instances all involve references by the prosecutor to a hammer. The prosecutor argued to the jury that the blunt object that caused the contusions and lacerations to the victim's head was a hammer. The autopsy revealed several marks on the victim's head; some were round, and others were claw-shaped. According to the evidence, defendant was involved in construction projects and possessed at least two claw hammers. The prosecutor's argument that defendant used a hammer to assault the victim was thus a reasonable inference to be drawn from the evidence. Further, defense counsel had an opportunity to rebut the inference that a hammer was used, and in fact defense counsel did argue in his closing argument that there was no evidence of a hammer and that common sense dictates that a hammer was not used. We hold that these arguments did not infect the trial with unfairness and that the trial court did not abuse its discretion by failing to intervene *ex mero motu*.

The other allegedly prejudicial statements occurred during defendant's sentencing proceeding. "[T]he foci of the arguments in the two phases are significantly different, and rhetoric that might be prejudicially improper in the guilt phase is acceptable in the sentencing phase." *State v. Artis*, 325 N.C. at 324, 384 S.E.2d at 496.

Several of the statements again involved references to a hammer. We first note that the State's forensic pathologist suggested during sentencing that the round and claw-shaped marks on the victim's head could have been inflicted by a hammer. On cross-examination of defendant's forensic pathologist, defendant did not object when the prosecutor inquired about the pain caused when someone is hit with a hammer. Accordingly, we hold that use of a hammer was a reasonable inference based on the evidence.

**[25]** Next, defendant complains about the prosecutor's statement that defendant was "making a thousand dollars a week sometimes off of each girl." However, the victim's daughter testified that she would in fact generate a thousand dollars a week in prostitution and illegal drugs for defendant. Thus, this statement was supported by the evidence. Then the prosecutor mentioned that defendant took advantage of people and that he told the victim, "you're going to die today." A review of the transcript shows that there was evidence that defendant had manipulated people. Further, we hold that an argument that defendant told the victim that he would die on the day defendant murdered him is not so grossly improper as to require the trial court to intervene *ex mero motu*. In another complained-of comment, the prosecutor correctly anticipated defense counsel's plea for sympathy for defendant.

**[26]** Later, the prosecutor stated that he "thought Mr. Barnes [defense counsel] was going to kill" defendant's ex-wife. During the ex-wife's testimony, defense counsel asked whether she knew defendant during the time of his first wife's death; the witness had a grin on her face, was unable to speak for a minute, and had to have the question repeated. In context the prosecutor's closing argument was certainly not meant literally, but was meant to imply that defense counsel's reaction demonstrated that the witness' demeanor and lack of responsiveness were rather damaging to defendant's case. This Court does not in any way condone even the most benign implication that an attorney appeared ready to or capable of harming a witness. As this Court has previously stated, "a trial attorney may not make uncomplimentary comments about opposing counsel, and should 'refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives.' " *State v. Sanderson*, 336 N.C. 1, 10, 442 S.E.2d 33, 39 (1994) (quoting *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 346 (1967)). Further, such comments do not comport with the General Rules of Practice for the Superior and District Courts, which mandate that "[a]ll personalities between counsel should be avoided" and that "[c]ounsel are at all times to conduct themselves with dignity and propriety." Gen. R. Pract. Super. and Dist. Ct. 12, 1999 Ann. R. N.C. 10. However, based on the record in this case, the trial court did not abuse its discretion by failing to intervene *ex mero motu*.

**[27]** The prosecutor then mentioned Alzheimer's disease, which apparently referred to the 180-degree turnaround in the evidence presented by defendant's witnesses. We can discern no prejudice to defendant by this analogy to Alzheimer's disease.

**[28]** Defendant also argues that the prosecutor improperly stated that defendant's expert witness was being paid to give favorable testimony. Even assuming *arguendo* that the statement was improper, it does not entitle defendant to a new sentencing proceeding. *State v. Hill*, 347 N.C. 275, 300, 493 S.E.2d 264, 278 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 1099 (1998). Next, defendant argues that the prosecutor improperly argued that defendant attempted to suborn perjury and placed a contract on Thomas Braswell. We have reviewed the record and hold that these inferences were based on the evidence and were not grossly improper.

**[29]** Defendant challenges the prosecutor's attempt to discredit defendant's evidence that he had a loving relationship with his family. This argument was proper during the sentencing proceeding which focuses on defendant's character. *See* N.C.G.S. § 15A-2000(d)(2); *State v. Gray*, 347 N.C. at 186, 491 S.E.2d at 558.

As for the remaining prosecutorial remarks which defendant submits were improper and prejudicial, we have reviewed them and hold that they were either sufficiently supported by the evidence, not so grossly improper as to require the trial court to intervene *ex mero motu*, or both. Therefore, we conclude that, even viewed collectively, defendant's contention that the prosecutor's remarks entitled him to a new trial or sentencing proceeding is meritless.

Defendant next contends that the trial court erred in denying his motion to set aside the verdict. Defendant argues that the evidence was insufficient to support his conviction and, alternatively, that the jury sentenced him to death under the influence of passion, prejudice, and other arbitrary factors.

The denial of a motion to set aside the verdict on the basis of insufficient evidence is within the discretion of the trial court and is reviewable on appeal under an abuse of discretion standard. *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985); *see also Anderson v. Hollifield*, 345 N.C. 480, 483, 480 S.E.2d 661, 663 (1997). As previously discussed, the jury's verdict was consistent with substantial evidence regarding each element of first-degree murder and with defendant's being the perpetrator of the offense. Defendant's argument that the jury imposed the death penalty under the influence of passion, prejudice, and other arbitrary factors is also rejected and will be fully discussed later as required by N.C.G.S. § 15A-2000(d)(2). These assignments of error are overruled.

By his final assignment of error, defendant contends that the trial court erred in denying defendant's motion for a new hearing. In support of his contention, defendant references his above arguments. Having determined that no prejudicial error occurred based on any of defendant's earlier arguments, we are compelled to reject this argument as well.

## PRESERVATION ISSUES

Defendant raises two additional issues which he concedes have been decided contrary to his position previously by this Court: (i) that the trial court erred in denying defendant's motion to instruct the jury that every nonstatutory mitigating circumstance had mitigating value as a matter of law, and (ii) that the trial court erred in denying defendant's motion to substitute the word "must" for the word "may" in its instructions in sentencing Issues Three and Four. Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving the issues for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY

Finally, defendant argues that the sentence of death in this case was imposed under the influence of passion, prejudice, or other arbitrary considerations and that, based on the totality of the circumstances, the death penalty is disproportionate. We are required by N.C.G.S. § 15A-2000(d)(2) to review the record and determine (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel, we are convinced that the jury's findings of the two aggravating circumstances submitted were supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[30] Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *State v. Robinson*, 336 N.C. 78, 133, 443 S.E.2d 306, 334 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases within the pool which are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant was convicted of first-degree murder based on premeditation and deliberation. The jury found both the submitted aggravating circumstances: (i) that the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, N.C.G.S. § 15A-2000(e)(7); and (ii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

Three statutory mitigating circumstances were submitted for the jury's consideration: (i) that defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and (iii) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found none of these three statutory mitigating circumstances to exist.

Twenty-six nonstatutory mitigating circumstances were submitted; and the jury found nine of these to exist and have mitigating value: (i) that defendant displayed a kind and generous spirit towards many friends in his community, (ii) that he had been helpful to the needs of others within his community, (iii) that he provided a home

to several foster children, (iv) that he had built several churches for the community, (v) that he had been a good provider for his family, (vi) that he had used his work skills to the benefit of those within his community, (vii) that the relationship between defendant and the victim's daughter was an extenuating circumstance, (viii) that defendant had been sensitive to the needs of others within his community, and (ix) that defendant had been productive in his lifetime despite his limited formal education.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is not substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate.

In five of the seven cases in which this Court has concluded that the death penalty was disproportionate, the jury did not find the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181; *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163; *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703. Since the jury in the present case found this statutory aggravating circumstance to exist, this case is distinguishable from those cases. As we have previously stated, "[w]hile this fact is certainly not dispositive, it does serve as an indication that the sentence of death . . . is not disproportionate." *State v. Walls*, 342 N.C. at 72, 463 S.E.2d at 777. Defendant's crime in this case, which included multiple blunt-force injuries to the head of the victim, multiple defensive wounds to the victim's arms and leg, and manual strangulation to death, is equally brutal to other murders where a death sentence was imposed. The evidence of the defensive wounds and the amount of time required for fatal strangulation indicates that the victim suffered before he died and that he was aware of but unable to prevent his impending death.

That defendant was convicted of premeditated and deliberate murder is also significant. "The finding of premeditation and deliber-

ation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. at 341, 384 S.E.2d at 506.

In the other two cases in which we have concluded that the death penalty was disproportionate, the jury did find that the murders were especially heinous, atrocious, or cruel. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170. However, both cases are distinguishable from the present case on other grounds. In *Stokes* the Court emphasized that the defendant was found guilty of first-degree murder based upon the felony-murder rule; that there was little, if any, evidence of premeditation and deliberation; and that the defendant was seventeen years old at the time of the murder and acted in concert with a considerably older co-felon. *State v. Stokes*, 319 N.C. at 21, 24, 352 S.E.2d at 664, 666. In the instant case, defendant was a sixty-nine-year-old adult at the time of the murder, acted alone, and was found guilty of first-degree murder on the basis of premeditation and deliberation.

In *Bondurant* the defendant shot the victim but then immediately directed the driver of the car in which they had been riding to proceed to the emergency room of a hospital. *State v. Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. In concluding that the death penalty was disproportionate, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. *Id.* at 694, 309 S.E.2d at 182. In contrast, the evidence in the present case tended to show that defendant did have a motive to kill, namely, the fact that the victim was to testify against defendant in a criminal prosecution. Moreover, no evidence in this case suggests that defendant sought medical help for the victim.

Another distinguishing characteristic of this case is that two aggravating circumstances were found by the jury. Of the seven cases in which this Court has found a sentence of death disproportionate, in only two, *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170, and *State v. Young*, 312 N.C. 669, 325 S.E.2d 181, did the jury find the existence of multiple aggravating circumstances. *Bondurant*, as discussed above, is clearly distinguishable. In *Young* this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance, which the jury found in the present case. Moreover, the jury in the present case found as an aggravating circumstance that defendant committed the murder to hinder the enforcement of laws. *See State v. Maynard*, 311

N.C. 1, 35-36, 316 S.E.2d 197, 216 (holding death penalty not dispro-
portionate where the defendant beat his victim in the head and killed
him because the victim had agreed to testify against the defendant in
another matter pursuant to a plea arrangement; the jury found as
aggravating circumstances that the murder was committed to hinder
the enforcement of laws and that it was especially heinous, atrocious,
or cruel), *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984).

Defendant argues that although at the time of the murder he had
yielded to the temptations of the victim's daughter, a young woman
who drew him into a ring of drug addicts, in his younger years and
prior to the death of his wife, he had been an upstanding, hardwork-
ing citizen. These facts are reflected in the nonstatutory mitigating
circumstances found by the jury. The jury considered these mitigat-
ing circumstances in reaching its result, and we cannot say the jury's
failure to find that these mitigating circumstances outweighed the
aggravating circumstances renders the penalty disproportionate.
*State v. Gray*, 347 N.C. at 192, 491 S.E.2d at 561.

Although we review all of the cases in the pool when engaging in
this statutory duty, as we have repeatedly stated, it is worth noting
again that "we will not undertake to discuss or cite all of those cases
each time we carry out that duty." *State v. McCollum*, 334 N.C. at 244,
433 S.E.2d at 164. We conclude that the present case is more similar
to certain cases in which we have found the sentence of death
proportionate than to those in which we have found the sentence dis-
proportionate or those in which juries have consistently returned
recommendations of life imprisonment.

Accordingly, we conclude that defendant received a fair trial and
capital sentencing proceeding, free from prejudicial error, and that
the sentence of death recommended by the jury and ordered by the
trial court in the present case is not disproportionate.

NO ERROR.

Justices MARTIN and WAINWRIGHT did not participate in the con-
sideration or decision of this opinion.