An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-85

Filed 6 August 2025

Davidson County, Nos. 22JT000184-280, 22JT000185-280

IN THE MATTER OF: T.J.S. & W.B.S.

Minor Children

Appeal by respondent-father from orders entered 25 September 2024 by Judge Mary F. Covington in Davidson County District Court. Heard in the Court of Appeals 11 June 2025.

> *Sheri A. Woodyard for petitioner-appellee Davidson County Department of Social Services.*
>
> *Michelle FormyDuval Lynch for appellee Guardian ad Litem.*
>
> *Reeves DiVenere & Wright, by Anné C. Wright, for respondent-appellant father.*

FREEMAN, Judge.

Respondent-father appeals from the trial court's orders terminating his parental rights to two of his children: T.J.S. ("Tristan") and W.B.S. ("Will").[1] On

---

[1] Pursuant to N.C. R. App. P. 42(b), pseudonyms are used to protect the juveniles' identities.

appeal, respondent-father contends that the trial court deprived him of a fundamentally fair hearing and erred in concluding grounds existed to terminate his parental rights under subsections 7B-1111(a)(1), (2), and (6) of our General Statutes. After careful review, we affirm the trial court's orders.

## I.     Factual and Procedural Background

Respondent-father and his wife, Sarah Starr, lived together with five children—James, Tristan, Will, Monica, and Mallory.  Respondent-father is the biological father of James, Tristan, and Will.  Starr is the biological mother of Tristan, Will, Monica, and Mallory.  Only Tristan and Will are the subjects of this appeal.  In September 2019, the family lived in California, and Shasta County Department of Social Services had custody of James, Tristan, Monica, and Mallory due to James having an "unexplained black eye and unexplained bruises on his torso."[2]  In June 2020, the children were returned to the custody of respondent-father and Starr.[3]

In April 2022, the family moved to North Carolina and resided in the home of Starr's aunt, Shellie Barnes.  While the family lived with Barnes, the adults in the home repeatedly physically and emotionally abused James, the oldest child.  They beat James with tools including belts and paddles.  Barnes tasered James "all over his body."  Some of the specific instances of abuse were documented on cell phone or home surveillance cameras:

---

[2] Will was born in California in February 2022.

[3] The trial court in California relinquished jurisdiction to North Carolina on 30 January 2023.

i. On July 13, 2022, Shellie Barnes screamed and threatened [James] in the yard while she was armed with a large wooden stick. He was crying, shaking, and promised to be good.

ii. On August 21, 2022, [Monica] was playing outside near where Mrs. Starr repeatedly beat [James] with a belt on his bare legs, back, and buttocks. His pants were down around his ankles and he rolled around and cried on the ground from pain. He was hit thirteen times on his legs, back and buttocks area and two times . . . near or on his penis.

iii. On September 27, 2022, [James] was secured to an outdoor chair with duct tape around his ankles and wrists. [His] mouth was covered and his head was secured to the back of the chair with duct tape. He showed signs of distress.

iv. On September 28, 2022, Ms. Barnes arrived home, exited her vehicle, and ran to [James] and struck him across the head with significant force.

v. On September 28, 2022, the family was in the back yard where Mrs. Starr yelled at [respondent-father] and criticized him for not punishing [James] when she felt he deserved it. [James] stood on the other side of the yard from Mrs. Starr. He had a dog muzzle on his face and Mrs. Starr threw metal pots at [James]. [Mallory] picked up the pots and took them back to Mrs. Starr.

vi. On September 28, 2022, Shellie Barnes fired a gun in the direction where [James] was running laps around the perimeter of the yard.

vii. On September 29, 2022, [James] was restrained in a chair and Mrs. Starr grabbed his head and yanked it backwards with force and poured a bottle of water [o]n his face and over his head.

viii. On October 7, 2022, [James] searched the trash bags on the back porch of the residence for food. After he looked

through the trash, [James] got on his hands and knees and drank water from the dog bowl on the porch.

ix. On October 10, 2022, Mrs. Starr made [James] lift his shirt and she hit his bare back and buttocks approximately twenty times with a belt. She also hit him on his genital area once and on his bare hands five times. [James] appeared to be in significant pain and marks appeared on his body between the strikes. During the beating, [Tristan] walked back and forth between Mrs. Starr and [James].

x. On October 12, 2022, [respondent-father] and Mrs. Starr took turns beating [James] with a belt and with their hands for approximately eighteen minutes, while [James] was wearing only underwear. [Respondent-father] backhanded [James] in the face. Mrs. Starr held [James] down so [respondent-father] could hit him with the belt all over his body. Mrs. Starr chased [James] around with the belt when he ran from her.

The abuse also involved humiliation. On one occasion, the adults forced James to wear a sign in public that read:

I am 9 years old I wear a diaper cause I poop and pee on myself everyday for attention I will sit in my own feces (poop pee) for hours. I smile, laugh and play with a diaper full of poop while doing so. I don't care!!!!! I do it on purpose I don't care.

James was home-schooled, while the other school-aged children attended public school. James was permitted to shower and change clothes once per week, regardless of whether he was dirty or soiled himself. In May and June 2022, James was forced to sleep outside in a tent in the backyard.

On 18 October 2022, respondent-father and Starr took James for a psychiatric appointment because of issues he had controlling his bladder and bowels. That night,

at around 5:00 p.m. or 6:00 p.m., the adults locked James in the outdoor dog pen and forced him to sleep outside all night.

On the morning of 19 October 2022, deputies were called to the family's home after receiving reports that a child was being made to sleep outside in a dog pen. When law enforcement arrived, they found James locked inside the pen. The pen was approximately ten feet by ten feet, enclosed by a six-foot tall chain link fence topped with barbed wire and covered with tarps. In the pen, there was a wooden platform, with a doghouse on top of the platform. The temperature that night had dropped as low as thirty degrees Fahrenheit, and the dog had been allowed to sleep in the house due to the low temperature. James only had a soiled blanket for warmth. James felt "lonely and afraid." Respondent-father and Starr admitted to locking James in the pen each night for the previous two weeks because James could not "control his bowels and bladder."

On 20 October 2022, Davidson County Department of Social Services ("DSS") filed juvenile petitions alleging that Tristan and Will were neglected and dependent juveniles. That same day, DSS obtained nonsecure custody of the five children.[4] Respondent-father and Starr were both arrested on 19 October 2022; respondent-father was convicted of "neglect child abuse, severe mental emotional injury, and intentional child abuse severe physical injury" on 5 December 2023.

---

[4] Many of the following proceedings involved all of the children, but this procedural history is limited to only that involving Tristan and Will.

Respondent-father was incarcerated throughout the proceedings and is projected to be released from prison on 14 February 2028.

On 7 June 2023, the trial court conducted adjudication and disposition hearings. In an order entered on 11 June 2023, the trial court adjudicated Tristan and Will to be neglected and dependent juveniles. In the disposition order, the trial court concluded that it was in the best interests of Tristan and Will to remain in custody of DSS. The trial found that respondent-father had not entered into a case plan with DSS, and if he wished to reunify with the children, he needed to (1) contact the social worker at least twice per month; (2) identify potential relatives for placement for the children; and (3) participate in available substance abuse treatment and parenting classes and present the court with certificates of completion. The trial court further found that respondent-father had written to the social worker two times since DSS filed the juvenile petitions and had not sent back a signed case plan. Respondent-father did not appeal this order.

The trial court conducted an initial permanency planning hearing on 2 August 2023. In its written order entered 7 September 2023, the trial court made factual findings that: (1) respondent-father still had not entered into a case plan; (2) had written to the social worker a total of three times to ask about the children; (3) respondent-father had not enrolled in mental health or substance abuse treatment; and (4) respondent-father had provided DSS with twenty-eight certificates for completing parenting classes. Both DSS and the Guardian ad Litem ("GAL")

recommended "that the permanent plan of care for the children be established as a primary plan of guardianship with a relative or court approved caretaker and a secondary plan of adoption." The trial court adopted guardianship as the primary plan and adoption as the secondary plan, and relieved DSS of the obligation to make reunification efforts. The trial court ordered respondent-father to continue contacting DSS at least twice per month.

On 12 December 2023, DSS filed a petition for the termination of parental rights for both respondent-father and Starr with respect to Tristan and Will. On 24 January 2024, the trial court conducted a second permanency planning hearing. In its written order filed on 27 February 2024, it found that respondent-father still had not entered into a case plan, not engaged in mental health or substance abuse treatment classes, and had presented no evidence that he was continuing to take parenting classes.

On 24 July 2024, Starr relinquished her parental rights with respect to Tristan and Will. On 9 August 2024, DSS voluntarily dismissed the termination of parental rights action with respect to Starr.

On 25 July 2024, the trial court held a hearing on the termination of respondent-father's parental rights regarding Tristan and Will. The trial court received testimony from respondent-father, the children's social worker, and Tristan and Will's foster parents, and considered multiple reports documenting the case's history. During DSS's cross-examination of respondent-father, the trial court asked

him several questions about the abuse of James and why he acted the way that he did. The trial court repeatedly asked respondent-father why he did nothing to stop the abuse of James or shield the younger children from it, why he participated in the abuse, why he did not move out of the house, whether he took responsibility for failing to protect his children, and whether he was afraid of Starr. Many of these questions were asked in short succession and sometimes appeared to overlap with respondent-father's answers.

On 25 September 2024, the trial court entered written orders terminating respondent-father's parental rights to Tristan and Will. The trial court made detailed findings of fact about the abuse that James endured by Starr, Barnes, and respondent-father, and found that "[a]ll of the other children in the home were exposed to the extreme abuse of [James]." The trial court also found that "[t]he other children in the home were traumatized by having to watch [James] live in the abusive conditions while they lived seemingly normal lives[,]" and that at least once Tristan was "made to participate in and observe the abusive activities, for example, . . . when [Tristan] was walking in between Mrs. Starr and [James] when she was beating him with a belt." The court made the following factual findings in both orders:

> 41. The Court finds that [respondent-father] actively participated in the physical and emotional abuse of [James].
>
> 42. [Respondent-father] has made no progress towards reunification with the minor child or correcting the issues that brought the minor child into [DSS] custody.

43. There has been no positive substantial change in [respondent-father's] circumstances since the minor child was brought into [DSS] care.

44. The respondent[-]father has other children who were also adjudicated to be abused, neglected, and/or dependent.

45. The Court finds that the same issues that brought the minor child into care, predominantly [respondent-father's] inability to provide for and care for the minor children and his inability to recognize his responsibility for the minor child coming into [DSS] care continue to exist.

46. Based on [respondent-father's] testimony today and the history of the case, the Court finds that [respondent-father] has not demonstrated to the Court that he acknowledges his responsibility for the children coming into [DSS] custody; therefore, he cannot protect the children in the future.

47. The Court also finds as an ultimate fact that the minor child has been in the continuous custody of [DSS] since October 19, 2022, a period in excess of twelve months prior to the filing of the petition in this matter. The Court finds that [respondent-father] has failed to make reasonable progress under the circumstances to correct the conditions that led to the removal of the minor child. Furthermore, the Court finds that [respondent-father] had the ability to engage in and complete these services; however, he failed to do so. Although he is unable to provide a home for the child due to his incarceration, he has not shown a change or growth in his thought process as to how to protect the child from future abuse and/or neglect.

48. The Court makes the ultimate finding of fact that the minor child was adjudicated to be a neglected and dependent juvenile on June 7, 2023; that [respondent-father] does not have a stable home that is safe and suitable; he does not have a steady source of income; and he has not acknowledged his role in why the minor child came into care. He was not able to express how he would parent differently or protect his children now and how he

should have protected his children prior to the children being brought into [DSS's] care. The respondent[-]father's older son, [James], was previously in the custody of the Department of Social Services in Shasta County, California in 2019 due to having an unexplained black eye and unexplained bruises on his torso. There is already a pattern of abuse in [respondent-father's] home. The Court finds that there would be not only a probability of the repetition of the neglect in the event custody were to be returned to the respondent[-]father, but a likelihood of a repetition of neglect would occur.

. . .

51. The Court finds as an ultimate fact that the respondent[-]father is incapable of providing the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile and that there is a reasonable probability that such incapability will continue for the foreseeable future as the respondent[-]father is incarcerated until February 14, 2028. He has not addressed the conditions that brought the minor child into care. The respondent[-]father presented no evidence of an appropriate child care arrangement. The respondent[-]father is unavailable to parent the child and lacks an appropriate child care arrangement.

The trial court concluded that grounds existed for the termination of respondent-father's parental rights base on neglect, dependency, and willful abandonment pursuant to subsections 7B-1111(a)(1), (2), and (6) of our General Statutes, and that termination of parental rights was in the children's best interest. Respondent-father timely appealed.

## II.    Jurisdiction

This Court has jurisdiction to review "[a]ny order that terminates parental rights or denies a petition or motion to terminate parental rights." N.C.G.S. § 7B-1001(a)(7) (2023).

### III.    Standard of Review

There are two stages of a termination of parental rights proceeding: the adjudicatory stage and the dispositional stage. At the adjudicatory stage, "the party petitioning for the termination must show by clear, cogent, and convincing evidence that grounds authorizing the termination of parental rights exist" under section 7B-1111(a) of our General Statutes. *In re Young*, 346 N.C. 244, 247 (1997); *see also In re S.D.C.*, 373 N.C. 285, 289 (2020). "If [a] trial court's finding of fact is supported by clear, cogent, and convincing evidence, it will be deemed conclusive even if the record contains evidence that would support a contrary finding." *In re S.R.*, 384 N.C. 516, 520 (2023) (cleaned up). Further, "[u]nchallenged findings are deemed to be supported by the evidence and are binding on appeal." *In re M.S.E.*, 378 N.C. 40, 47 (2021). "A trial court's finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably support the trial court's ultimate finding of fact." *In re G.C.*, 384 N.C. 62, 65 (2023) (cleaned up). We review the trial court's conclusions of law de novo. *In re A.A.*, 381 N.C. 325, 334 (2022). "[A]n adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order." *In re J.S.*, 374 N.C. 811, 815 (2020).

At the dispositional stage, the trial court determines whether termination of the respondent-parent's parental rights is in the child's best interest. *In re C.B.*, 375 N.C. 556, 560 (2020). We review the "trial court's assessment of a juvenile's best interests . . . solely for an abuse of discretion." *Id.*

Respondent-father's arguments in this matter solely focus on the adjudicatory stage of the proceeding. Accordingly, we review whether the trial court's findings of facts are supported by clear, cogent, and convincing evidence and whether the supported factual findings in turn support the trial court's conclusions of law.

## IV.    Discussion

On appeal, respondent-father argues: (1) the trial court was so biased, partial, and hostile as to deprive respondent-father of a fundamentally fair hearing; and (2) the trial court erred in concluding grounds existed to terminate his parental rights under N.C.G.S. §§ 7B-1111(a)(1), (2), and (6). We address each argument in turn.

## A. Fundamentally Fair Hearing

Respondent-father first contends that the "trial court's bias, partiality, and prejudice deprived [respondent-father] of a fundamentally fair hearing." Respondent-father specifically contends that the trial court said respondent-father's answers sounded "crazy" and "twisted"; "stepped on [respondent-father's] answers and did not allow [him] to answer questions before moving onto the next"; and asked questions that were not based on evidence in the record. Respondent-father argues

these instances demonstrate that the trial was so "biased and improper" as to deprive him of "the proceedings of a fair tribunal."[5]

"The [trial] court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." N.C.G.S. § 8C-1, Rule 614(a) (2023). "The [trial] court may interrogate witnesses, whether called by itself or by a party." *Id.* § 8C-1, Rule 614(b) (2023). "A trial court's actions pursuant to Rule 614 are reviewed under an abuse of discretion standard." *In re L.B.*, 184 N.C. App. 442, 451 (2007). However, "[i]n neither case does a trial court shed its impartiality or abandon its role as an independent decisionmaker." *In re J.R.*, 383 N.C. 273, 279 (2022).

"[T]he danger of impartiality is relevant primarily in a jury trial." *In re L.B.*, 184 N.C. App. at 451. Indeed, the trial court's duty to remain impartial "requires that the trial judge must not express any opinion as to the weight to be given to or credibility of any competent evidence presented *before the jury*." *State v. Fleming*, 350 N.C. 109, 126 (1999) (emphasis added) (cleaned up). In a bench trial, as is the case here, "there is no danger in the trial court suggesting an opinion as to the weight of the evidence or the credibility of [a] certain witness as the trial court is the ultimate arbiter of such issues." *In re L.B.*, 184 N.C. App. at 451.

---

[5] Respondent-father was represented by counsel in the hearing.

"No objections are necessary with respect to . . . questions propounded to a witness by the court but it shall be deemed that proper objection has been made and overruled." N.C.G.S. § 8C-1, Rule 614(c) (2023). However, when a party challenges that the trial court's questioning infringed upon their constitutional right to a fair hearing or that the trial court was prejudiced against the party, as respondent-father argues here, this rule does not apply and the issues must be preserved for appellate review. *See In re J.N.*, 381 N.C. 131, 133 (2022) (holding that unpreserved constitutional arguments are waived on appeal); *Cox v. Cox*, 238 N.C. App. 22, 35 (2014) (holding that unpreserved arguments of judicial bias are waived on appeal).

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). Our Supreme Court recently clarified that in this context, constitutional claims:

> must be preserved for appellate review like any other. To do so, a parent must inform the trial court and opposing parties that the parent is asserting a challenge on constitutional grounds and articulate the basis for that constitutional claim. If the parent fails to do so, the claim cannot be reviewed on appeal.

*In re K.C.*, 386 N.C. 690, 691 (2024) (cleaned up); *see also In re J.N.*, 381 N.C. 131, 133 (2022) ("[T]he existence of a constitutional protection does not obviate the requirement that arguments rooted in the Constitution be preserved for appellate

review."); *State v. Garcia*, 358 N.C. 382, 410 (2004) ("It is well settled that constitutional matters that are not raised and passed upon at trial will not be reviewed for the first time on appeal." (cleaned up)).

Issues related to a trial court's bias or prejudice likewise must be preserved. "The type of judicial bias which is considered to be improper is bias based upon the judge's personal bias or prejudice concerning a party." *Cox*, 238 N.C. App. at 34 (cleaned up). The proper course of action is for a party to move for the judge's recusal. *See id.* at 35. "This Court has held that an alleged failure to recuse is not considered an error automatically preserved under N.C. R. App. P. 10(a)(1). . . . Where appellant failed to move that the trial judge recuse [herself], he cannot later raise on appeal that the judge's alleged bias based on an undesired outcome." *Sood v. Sood*, 222 N.C. App. 807, 812 (2012) (cleaned up).

Because defendant did not object to any of the trial court's questions or move that the trial court recuse itself based on personal bias or prejudice, we cannot review defendant's argument that the trial court's questioning deprived him of a fundamentally fair hearing. Accordingly, we dismiss this argument as unpreserved.

**B. Grounds to Terminate Parental Rights**

Respondent-father next challenges the trial court's determination that his parental rights were subject to termination pursuant to subsections 7B-1111(a)(1), (2), and (6) of our General Statutes.

A court may terminate an individual parent's rights "upon a finding of one or more" of the eleven statutory grounds. N.C.G.S. § 7B-1111(a) (2023). A trial court may terminate an individual's parental rights pursuant to subsection 7B-1111(a)(1) if "[t]he parent has abused or neglected the juvenile" within the meaning of those terms provided in section 7B-101. N.C.G.S. § 7B-1111(a)(1) (2023). As is relevant here, a juvenile may be adjudicated neglected if their parent "[d]oes not provide proper care, supervision, or discipline," or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. §§ 7B-101(15)(a), (15)(e) (2023). Further, "it is relevant whether that [a] juvenile lives in a home . . . where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." *Id.* § 7B-101(15).

"[A] prior adjudication of neglect may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect." *In re Ballard*, 311 N.C. 708, 713–14 (1984). But because "termination of parental rights for neglect may not be based solely on conditions which existed in the distant past but no longer exist," *id.* at 714, "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect[,]" *id.* at 715.

In other words, when "the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 835, 843 (2016). Ultimately, "[t]he

- 16 -

determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." *Ballard*, 311 N.C. at 715 (emphasis omitted). "After weighing this evidence, the trial court may find that neglect exists as a ground for termination if it concludes the evidence demonstrates a likelihood of future neglect by the parent." *In re B.T.J.*, 377 N.C. 18, 21 (2021) (citation omitted).

### 1. *Factual Findings*

Here, it is undisputed that Tristan and Will were previously adjudicated neglected.[6] Respondent-father challenges three factual findings, which are the same in both orders:

> 43. There has been no positive substantial change in [respondent-father's] circumstances since the minor child was brought into [DSS] care.
>
> . . .
>
> 46. Based on [respondent-father's] testimony today and the history of the case, the Court finds that [respondent-father] has not demonstrated to the Court that he acknowledges his responsibility for the children coming into [DSS] custody; therefore, he cannot protect the children in the future.
>
> . . .
>
> 48. The Court makes the ultimate finding of fact that the

---

[6] To the extent that respondent-father challenges the adjudication of Tristan and Will as neglected juveniles, we decline to address this argument because respondent-father did not appeal the adjudication order. *See In re A.S.M.R.*, 375 N.C. 539, 544 (2020) ("[A] respondent's failure to appeal an adjudication order generally serves to preclude a subsequent collateral attack on that order during an appeal of a later order terminating the parent's parental rights.").

minor child was adjudicated to be a neglected and dependent juvenile on June 7, 2023; that [respondent-father] does not have a stable home that is safe and suitable; he does not have a steady source of income; and he has not acknowledged his role in why the minor children came into care. He was not able to express how he would parent differently or protect his children now and how he should have protected his children prior to the children being brought into [DSS's] care. The respondent[-]father's older son, [James], was previously in the custody of the Department of Social Services in Shasta County, California in 2019 due to having an unexplained black eye and unexplained bruises on his torso. There is already a pattern of abuse in [respondent-father's] home. The Court finds that there would be not only a probability of the repetition of the neglect in the event custody were to be returned to the respondent[-]father, but a likelihood of a repetition of neglect would occur.

Respondent-father argues that these findings are not supported by clear, cogent, and convincing evidence.[7] We disagree.

The record demonstrates that there was competent evidence to support the challenged findings. In the hearing, respondent-father consistently blamed Starr and Barnes for the abuse of James. To explain one instance of abuse when respondent-father participated in beating James with a belt, respondent-father testified the beating happened:

Because Mrs. Starr and Ms. [Barnes] thought that him getting into things and him, basically, having free range

---

[7] Respondent-father argues that the trial court's findings about neglect were based on its "improper cross-examination . . . during which the trial court did not allow [respondent-father] to fully answer some questions, prevented [him] from answering some questions at all, and asked leading questions, attributing to [respondent-father] things he did not say." But for the reasons stated above, this argument is foreclosed by his failure to preserve it for appellate review.

like his—cause his—it was about his consumption of food.

Q.: Like trash?

A.: Huh?

Q.: The food out of the trash?

A.: Like he would like—they were trying to fix like his eating habits, but him eating out of the garbage can and the trash bags and everything I don't know how that— what that up to that point what lead to him doing that but like—

Q.: Do you think maybe it was because he was hungry that's why he was trying to eat the food out of the trash?

. . .

A.: He would eat. I mean huh? He was—he got fed three meals a day.

Respondent-father testified that he backhanded James on one occasion because "I was told by [Barnes] that supposedly I need to be more of a man and discipline my son more because I wasn't . . . disciplining him enough." Respondent-father also testified that it was Barnes' idea to force James to wear the sign saying that he soiled himself in public. Respondent-father said he "didn't want to do it" but had no explanation for why he did nothing to stop it. When asked about why James was forced to sleep outside, respondent-father again blamed Barnes.

THE COURT: You're making it sound like it was one incident that he stayed outside one time, but he didn't, it was many, many nights, wasn't it? And you knew about all those nights. Even if you said you didn't know about that one. Didn't you know about all the other times he was sleeping outside?

[RESPONDENT-FATHER]: I knew—I knew he was— when we got here from California, he stayed inside for at least a month . . . month and a half to two months he stayed inside. Then, after that point, it just went haywire. [Barnes] started acting out. She started saying, "oh yeah," like a lot of mean things toward—towards my son.

THE COURT: What did you do to protect him then?

[RESPONDENT-FATHER]: Me and her—

THE COURT: When [Barnes] started acting out.

[RESPONDENT-FATHER]: Me and her got into—got into a—

THE COURT: Did you move out?

[RESPONDENT-FATHER]: —yelling match.

THE COURT: Did you take [James] and move out?

[RESPONDENT-FATHER]: No.

When explaining why he did not move his family out of Barnes' home, respondent-father said that he was "trying to look up rentals . . . the thing is—just that I didn't make enough [money]."

The trial court also asked respondent-father what he did to protect the other children from the abuse of James.

THE COURT: Okay. Did you think that was good for them to know and to see how . . . he was being treated? Do you think that was healthy for them mentally? So, what did you do to protect them at that moment, . . . during those times? Anything?

[RESPONDENT-FATHER]: Protection? I—

THE COURT: Do you know what it means to protect your

children?

[RESPONDENT-FATHER]: Yes.

THE COURT: You know that children cannot protect themselves?

[RESPONDENT-FATHER]: Yes.

THE COURT: That they are children and that the parents are their saviors, they are their safe guarders, they are their protectors. Did you protect your children.

[RESPONDENT-FATHER]: Ma'am, with all that stuff happening, no. I really couldn't—everything I said I got in an argument.

THE COURT: So, you were afraid of your wife?

[RESPONDENT-FATHER]: Not afraid, I just—

THE COURT: Didn't want to argue with her.

[RESPONDENT-FATHER]: I just didn't want to argue.

THE COURT: Okay.

[RESPONDENT-FATHER]: I didn't want me and her never fight so I didn't want it—the parents fighting. I mean, I did—we have had a couple of mishaps between me—me and Mrs. Starr to where we have fought over our children, had talks and stuff like that over our children but never—never this.

Respondent-father also testified that he did not stop his wife from abusing James.

THE COURT: Did you move him away from Mrs. Starr . . . who was doing all this to him? Did you do any of that to protect him?

[RESPONDENT-FATHER]: Like physically move him

away from Mrs. Starr?

THE COURT: From what he was going through. If you thought it was so bad, why didn't you do something about it? If you thought it was bad, you can imagine how your younger son must have felt.

[RESPONDENT-FATHER]: Yes. Well, in that case I—I didn't do nothing because I mean my wife—

THE COURT: Are you afraid of her?

[RESPONDENT-FATHER]: Huh?

THE COURT: You afraid of her?

[RESPONDENT-FATHER]: No. But she was my wife and—

THE COURT: Did you think she was treating the child right or appropriately or loved?

[RESPONDENT-FATHER]: At that point, no.

THE COURT: So why didn't you do something about it? Saying she's your wife is not an answer. Your child can't fight for themselves.

[RESPONDENT-FATHER]: Yes, I understand that.

Respondent-father consistently framed Barnes as the primary aggressor, and when asked, "your wife was doing the same thing [as Barnes]. You weren't trying to get away from her," respondent-father replied, "She's my wife, I—I mean—" and went on to explain that he would "do things different" to protect his children if he remained married to Starr, such as earning income and feeding or otherwise taking care of the children.

Although respondent-father testified that he was "taking responsibility," and "would do a lot of things different," his testimony consistently emphasized that other people or forces were responsible for the abuse of James and neglect of Tristan and Will. Further, respondent-father remained married to Starr, though she regularly abused James, and respondent-father still primarily blamed the abuse and neglect on living with Barnes. Additionally, the 24 January 2024 DSS report stated that respondent-father (1) had not entered into a case plan, (2) had not made DSS aware of his participation in any mental health or substance abuse classes, and (3) had not clarified whether he would reunite with Starr after they were no longer incarcerated. This testimony and evidence supports that respondent-father had not addressed the underlying causes that led to the children's removal, which in turn supports the trial court's finding of a likelihood of repetition of neglect if the children were returned to his care. *See In re M.A.*, 374 N.C. 865, 870 (2020) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect.").

There is clear, cogent, and convincing evidence that (1) "there has been no positive substantial change in [his] circumstances" since Tristan and Will were brought into DSS care, and (2) respondent-father had "not demonstrated to the [trial court] that he acknowledges his responsibility for the children coming into DSS custody; therefore, he cannot protect the children in the future." Further, the evidentiary facts reasonably support the trial court's ultimate finding of fact that respondent-father failed to acknowledge his role in why the children came into care

- 23 -

or "explain how he would parent differently or protect his children now and how he should have protected his children prior to being brought into" DSS care. Accordingly, these factual findings are binding on appeal. *In re J.A.M.*, 372 N.C. 1, 8 (2019) ("[T]he trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." (cleaned up)).

### 2. Conclusions of Law

We now review whether the factual findings support the trial court's conclusion of law that the ground of neglect existed to terminate respondent-father's parental rights. When there has been a long period of time between the past neglect and the termination hearing, the trial court must make findings about both the past neglect and the likelihood of repetition of neglect if the child were returned to the parent's care. *In re V.S.*, 380 N.C. 819, 822 (2022). "A parent's failure to make reasonable progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. at 870. "[A] parent's failure to demonstrate that sustained behavioral change of the type necessary to ensure the minor child's safety and welfare can support a conclusion that there is a likelihood of repetition of neglect." *In re B.A.J.*, 295 N.C. App. 593, 604 (2024) (cleaned up). Further, a parent's denial of their responsibility in the circumstances that led to the removal of the child can demonstrate a likelihood of repetition of neglect. *See In re K.Q.*, 381 N.C. 137, 146 (2022).

Here, the trial court found that Tristan and Will were previously adjudicated neglected and it made extensive findings about the past neglect of Tristan and Will. The trial court also made findings to support a repetition of future neglect if they were returned to respondent-father's care, including that respondent-father: did not enter into a case plan though DSS sent him one; made no progress towards reunifying with Tristan and Will; was unable to take responsibility for why Tristan and Will came into DSS care; failed to make reasonable progress to correct the conditions that led to the removal of Tristan and Will; failed to take responsibility for why he did not protect his children from the past abuse or neglect; and failed to explain how he would protect his children from future abuse or neglect. These findings support the trial court's concern that the issues of abuse and neglect had not been alleviated, and that there was a probability of repetition of neglect if Tristan and Will were returned to respondent-father's care. *See In re K.Q.*, 381 N.C. at 146 (upholding the trial court's determination of a likelihood of repetition of neglect where the findings showed that the parent denied his role in the domestic violence).

Accordingly, the trial court did not err by concluding that there was a likelihood of repetition of neglect and we affirm the trial court's determination that respondent-father's parental rights were subject to termination on the ground of neglect pursuant to subsection 7B-1111(a)(1) of our General Statutes.

"Because a finding of only one ground is necessary to support a termination of parental rights," *In re A.R.A.*, 373 N.C. 190, 194 (2019), we need not address the other grounds for termination found by the trial court.

## V.    Conclusion

The trial court's findings of fact are supported by clear, cogent, and convincing evidence, and in turn support the trial court's conclusion that the ground of neglect exists for the termination of respondent-father's parental rights.  Accordingly, we affirm the trial court's orders terminating respondent-father's parental rights.


AFFIRMED.

Judges GRIFFIN and STADING concur.

Report per Rule 30(e).